The defendants in an action pending in the Clarke Circuit Court appeal from that court's order denying their motions to compel the plaintiff Norma Leggett to arbitrate *Page 891 
her claims. We reverse and remand.
On October 12, 1995, Leggett borrowed $1,900.09 from Commercial Credit Corporation ("Commercial"). In connection with that transaction, she also purchased credit life insurance from American Health and Life Insurance Company ("American Health") and credit property insurance from American Bankers Insurance Company of Florida ("American Bankers").
Subsequently, Leggett received a "Notice of Pendency of Class Action and Proposed Settlement," dated January 7, 1997, apprising her that she was a plaintiff in a lawsuit styled Frances Hughes v.American Health Life Insurance Co., et al, pending in the Circuit Court of Calhoun County, Alabama, No. CV-96-615. The class in Hughes was essentially defined as "all individuals who entered into any loan agreements or other obligations with Commercial Credit Corporation on or after July 24, 1976, on which credit life insurance was purchased." On June 10, 1997, Leggett requested exclusion from the class action.
On October 14, 1997, she commenced her own action against Commercial, American Health, and American Bankers, alleging that they had fraudulently induced her to purchase credit life insurance and credit property insurance, which, she says, she was not "required to purchase." She further alleged that they sold her more insurance "than was needed to pay off the balance of the loan . . . [and did so] in violation of the Department of Insurance regulations governing the sale of insurance and the Alabama `Mini-Code," Ala. Code 1975, §§ 5-19-1 to -32. Also, she alleged, the excess premiums constituted a "finance charge" in addition to the finance charges listed in the "disclosure" forms, which she says failed to describe the true amount and nature of the charge. She sought a judgment "for compensatory damages, statutory damages, punitive damages and such other damages as may be deemed proper in an amount to be assessed by the jury." On November 19, 1997, Commercial and American Health moved to compel arbitration of the dispute, pursuant to arbitration provisions contained in the "Disclosure Statement, Note and Security Agreement" (the "Disclosure Statement") Leggett had signed.
On December 5, 1997, American Bankers removed the cause to the United States District Court for the Southern District of Alabama, on the basis of diversity jurisdiction. Leggett opposed removal, arguing, among other things, that the amount in controversy did not exceed $75,000, the jurisdictional requisite of 28 U.S.C. § 1332. In that connection, she submitted an affidavit "waiv[ing] any amount of an award in [the] matter over $70,000.00 exclusive of interest and costs." On March 3, 1998, the United States district court remanded the cause to the Clarke Circuit Court, "find[ing] that [American Bankers had] failed to meet its burden of proving by a preponderance of the evidence that the jurisdictional amount [had] been met."
In April 1998, American Bankers filed a document styled "Joinder in Motion to Compel Arbitration." The Clarke Circuit Court denied the motions to compel arbitration. In an order entered on June 8, 1998, the trial judge first determined that the contract did not provide that an arbitrator would determine whether the dispute was arbitrable in the first instance. Second, he concluded that Leggett had presented genuine questions of fact "concerning the formation of the agreement and consequently, [that] the issues concerning the making of the agreement to arbitrate [should] be submitted to a jury." Nevertheless, the trial judge ultimately concluded that the arbitration provisions were unconscionable, and, consequently, unenforceable. Commercial, American Health, and American Bankers appealed. Case 1971799 is the appeal of Commercial and American Health. Case 1971844 is the appeal of American Bankers. We first consider whether the trial court erred in *Page 892 
holding that the court, rather than an arbitrator, would decide the preliminary issues regarding the arbitrability of this dispute.
 I.
This issue is controlled by First Options of Chicago, Inc. v.Kaplan, 514 U.S. 938 (1995). On one side of the dispute in that case was "First Options of Chicago, Inc., a firm that clear[ed] stock trades on the Philadelphia Stock Exchange." Id. at 940. "[O]n the other side [were] three parties: Manuel Kaplan; his wife, Carol Kaplan; and his wholly owned investment company, MK Investments, Inc. (MKI)." Id. The only signatories to a contract containing an arbitration clause were First Options and MKI. Id. at 940-41. Nevertheless, when First Options asserted a claim to the Kaplans' individual assets for any deficiency it incurred in its dealings with MKI, it sought to compel the Kaplans to arbitrate the dispute against them through a "panel of the Philadelphia Stock Exchange." Id. at 940. "The Kaplans, however, who had not personally signed [a document containing an arbitration clause], denied that their disagreement with First Options was arbitrable. . . . The arbitrators decided that they had the power to rule on the merits of the parties' dispute, and did so in favor of First Options." Id. at 941.
On petition for certiorari review, the United States Supreme Court considered this very narrow question: "[W]ho [the court, or an arbitrator] should have the primary power to decide [whether the dispute was arbitrable in the first place]"? Id. at 942 (emphasis in original). In resolving that issue, the Court noted that it had "added an important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability." Id. at 944. The Court stated:
 "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is `clea[r] and unmistakabl]e]' evidence that they did so. . . . In this manner the law treats silence or ambiguity about the question `who [emphasis in First Options] (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question'whether [emphasis in First Options] a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement' for in respect to this latter question the law reverses the presumption. . . .
 "But, this difference in treatment is understandable. The latter question arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And, given the law's permissive policies in respect to arbitration, . . . one can understand why the law would insist upon clarity before concluding that the parties did not [emphasis in First Options] want to arbitrate a related matter. . . . One the other hand, the former question — the `who (primarily) should decide arbitrability' question — is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. . . . And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the `who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide."
Id. at 944-45 (emphasis added except where noted). Under that analysis, the Court concluded that the Kaplans had "not clearly agree[d] to submit the question of arbitrability to arbitration," *Page 893 
and, therefore, that the question of "the arbitrability of the Kaplan/First Options dispute was subject to independent review by the courts." Id. at 947. See also Dean Witter Reynolds, Inc. v.Fleury, 138 F.3d 1339, 1342-43 (11th Cir. 1998) ("Under the Supreme Court's decision in First Options of Chicago, Inc. v.Kaplan, courts, not arbitrators, should decide questions of arbitrability unless there is `clear and unmistakable evidence' that the parties intended to submit such questions to an arbitrator");Painewebber Inc. v. Elahi, 87 F.3d 589, 595 (1st Cir. 1996) ("the presumption established in [AT T Technologies,Inc. v. Communications Workers of America, 475 U.S. 643 (1986)], and First Options — that courts, not arbitrators, decide `arbitrability' unless the parties clearly intend otherwise is an exception to the `liberal federal policy favoring arbitration'");Investment Management Research, Inc. v. Hamilton,727 So.2d 71 (Ala. 1999) (discussing and analyzingFirst Options).
The Disclosure Statement at issue in this case provides in pertinent part:
 "Agreement to Arbitrate Claims. Any Claim, except those specified below in this Provision shall be resolved by binding arbitration in accordance with (i) the Federal Arbitration Act; (ii) the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association (`Arbitrator'); and (iii) this provision. . . . Examples of Claims that are governed by this Agreement include those involving:
"The Truth in Lending Act and Regulation Z;
"The Equal Credit Opportunity Act and Regulation B;
 "State insurance, usury, and lending laws; fraud or misrepresentation, including claims for failing to disclose material facts;
 "Any other federal or state consumer protection statute or regulation;
 "Your execution of this Provision and/or willingness to be bound by its terms and provisions; or
 "Any dispute about closing, servicing, collecting, or enforcing a Credit Transaction.
". . . .
 "Severability. If the Arbitrator or any court determines that one or more terms of this Provision or the arbitration rules are unenforceable, such determination shall not impair or affect the enforceability of the other provisions of this Agreement or the arbitration rules."
(Emphasis added.)
Although a question regarding the "execution of [the arbitration section] and/or willingness to be bound by its terms and provisions" would have been an arbitrable "claim," the severability clause expressly acknowledged that such a claim could be rejected by a court. In other words, the severability clause creates an ambiguity as to how such a claim is to be resolved. Consistent with the rule and analysis of First Options, we conclude that the Disclosure Statement does not contain the clear and unequivocal terms necessary to rebut the "reverse[d]" presumption,514 U.S. at 945, that the court will decide the initial question of arbitrability. Thus, the trial court properly held that it, rather than an arbitrator, should decide the preliminary issues regarding the arbitrability of this dispute.
 II.
Leggett also contends, and the trial court held, that there exists a question for a jury as to whether the parties entered an agreement to arbitrate. We disagree with this contention. This Court has stated:
 "There is scarcely a rule more firmly established than that the court, not the jury, will interpret . . . a contract . . . unless the court determines the contract to be ambiguous and one of the parties makes an offer of proof as to surrounding *Page 894 
facts and circumstances which would clarify the contract's meaning, in which case it is within the province of the jury to ascertain those facts and draw such inferences from them as are necessary to the interpretation of the contract upon proper instructions by the court."
Alpine Constr Co. v. Water Works Bd. of the City of Birmingham,377 So.2d 954, 956 (Ala. 1979) (emphasis added). As long as the contractual terms are clear and unambiguous, questions of their "legal effect [are] questions of law." Dill v. Blakeney,568 So.2d 774, 777 (Ala. 1990).
Again, the pertinent provisions of the Disclosure Statement provide: "Any Claim, except those specified below in this Provision shall be resolved by binding arbitration in accordance with (i) the Federal Arbitration Act; (ii) the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association (`Arbitrator'); and (iii) this provision." The Disclosure Statement defined a "Claim" as "any case, controversy, dispute, tort, disagreement, lawsuit, or claim now or hereafter existing between You and Us."
Although, as we discussed in Part I of this opinion, the contract equivocates somewhat as to who would initially decide whether particular disputes are within the scope of the arbitration provisions, it is abundantly clear (1) that there is a contract, and (2) that this dispute is within the scope of its arbitration provisions. Indeed, these observations are undisputed. Leggett bases her argument on the following affidavit:
 "My name is NORMA LEGGETT JOHNSON, and I am an adult resident citizen of Jackson, Clarke County, Alabama. I am the plaintiff in a lawsuit that I have filed in the Circuit Court of Clarke County, Alabama, against COMMERCIAL CREDIT CORPORATION, AMERICAN HEALTH 
LIFE INSURANCE COMPANY and AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, Civil action No. CV-97-183M. I filed my lawsuit in the Circuit Court of Clarke County, Alabama, and requested a jury trial. I hereby state under oath, of my own personal knowledge, information and belief, that I am entitled under the law to a jury trial in my lawsuit and I hereby state under oath that I want a jury trial of all the claims in my lawsuit.
 "When I borrowed money from COMMERCIAL CREDIT CORPORATION on October 12, 1995, no one at COMMERCIAL CREDIT said anything to me about any arbitration provision in the Disclosure Statement, Note and Security Agreement. I was not told to read the Disclosure Statement, Note and Security Agreement. I did not read it. The COMMERCIAL CREDIT CORPORATION person showed me the Disclosure Statement, Note and Security Agreement, and explained to me the number of monthly payments that I would have to make, and the amount of each monthly payment, and went over the collateral being used to secure the note. I was then told where to sign the document, which I did. At no time did anyone explain to me any terms of arbitration or what arbitration is, or discuss with me that by signing the document, COMMERCIAL CREDIT CORPORATION would argue that I had waived my right to a trial by jury. This was never explained to me, and I never understood it, and I never agreed to it. I never heard anything regarding arbitration with regard to my loan from COMMERCIAL CREDIT CORPORATION until after my lawsuit was filed.
 "At the time that this loan was made to me in October, 1995, I was working at Vanity Fair Corporation, where I have worked for more than 20 years. At the present time, I make $6.30 per hour there; in October, 1995, I was paid less per hour, but I am not certain of the amount. I have four children, and I am a single parent. In October, 1995, to the best of my knowledge, information *Page 895 
and belief, I was receiving child support for only one of my children, the youngest, Chelsey, in the amount of $200.00 per month. To the best of my knowledge, information and belief, my wages from Vanity Fair and the $200.00 child support for my daughter, Chelsey, were all the income that I had in October, 1995.
 Also, sometime around the first of April, 1994, my mobile home, all personal belongings and contents located in my mobile home, and my automobile, all caught fire and were destroyed. I was virtually left with nothing. COMMERCIAL CREDIT CORPORATION knew about this, because I had some of this property as collateral for a prior loan with COMMERCIAL CREDIT CORPORATION and when it was destroyed by fire, the insurance company paid COMMERCIAL CREDIT and COMMERCIAL CREDIT paid me approximately $3000.00-$5000.00, to the best of my knowledge, information and belief. In October, 1995, I do not believe that I was financially able to pay any fees to an arbitrator, which I understand can be as much as $1000.00 to $3000.00 per day. Had it been explained to me by anyone that by signing the Disclosure Statement, Note and Security Agreement, I would supposedly be agreeing to pay an arbitrator a fee of $1000.00 per day to arbitrate claims that I might have based on wrongful conduct against me and giving up my right to a trial by jury, I most certainly would not have agreed to any provision like that.
"Further affiant saith not."
Leggett's affidavit states only that she did not understand what arbitration involves. In fact, she concedes that she did not read the contract. In the arbitration context, this Court has stated that "`when a competent adult, having the ability to read and understand an instrument, signs a contract, [she] will be held to be on notice of all the provisions contained in that contract and will be bound thereby.'" Green TreeAgency, Inc. v. White, 719 So.2d 1179, 1180 (Ala. 1998).
In that case, White sought to avoid an arbitration provision that appeared on the reverse side of an installment contract she had signed.Id. at 1179-80. She made an argument similar to the one made here by Leggett. Specifically, White contended that "she was fraudulently induced into signing the contract because, she [said], the defendants did not inform her that it contained an arbitration clause." Id. at 1180. However, "[o]n the front of the contract, the following statements appear[ed]: `NOTICE: SEE OTHER SIDE FOR ADDITIONAL TERMS AND CONDITIONS OF THIS CONTRACT' and `CAUTION — IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.'" Id. The Court explained that "[t]he statement on the front alerted White that she should read
the entire contract." Id. (emphasis added).
The arbitration provisions Leggett signed were considerably more conspicuous than those in White. Specifically, the arbitration provisions Leggett signed appeared in a "boxed-in" section of the Agreement and spanned three pages. The provision began with the words: "READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO OBTAIN REDRESS THROUGH COURT ACTION." At the end of the second page of the arbitration provisions, Leggett's initials appear. Finally, on the third page, at the end of the arbitration provisions, were these statements: "READ THE ABOVE ARBITRATION PROVISION CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO OBTAIN REDRESS THROUGH COURT ACTION." Directly beneath these words, Leggett affixed her signature.
"The purpose of a signature is to show `mutuality and assent,' which are required *Page 896 
for a contract to be binding." Crown Pontiac, Inc. v.McCarrell, 695 So.2d 615, 618 (Ala. 1997). InCrown Pontiac, we reasoned:
 "[The absence of a signature under the arbitration clause shows a lack of mutuality and assent, where the contract contains a signature line specifically for the arbitration clause, but where [the party opposing arbitration] did not sign on that line, although he signed on other lines that similarly indicated agreement to specific terms."
Id. at 618-19 (emphasis in original). The assertions in Leggett's affidavit are insufficient to negate the effect of her initials and signature on the arbitration provisions of this document.
This case differs fundamentally from certain cases cited by Leggett, namely, Three Valleys Municipal Water District v. E.F. Hutton Co.,925 F.2d 1136 (9th Cir. 1991); Par-Knit Mills, Inc. v. StockbridgeFabrics Co., 636 F.2d 51 (3d Cir. 1980); and Shearson LehmanBrothers, Inc. v. Crisp, 646 So.2d 613 (Ala. 1994). Each of those cases turned on the question whether a contract existed. By contrast, the heart of the dispute in this case is the arbitration section of the contract, not the contract as a whole. In other words, there is no dispute that the parties entered into a contract. The only remaining issue, therefore, is whether a portion of that contract, namely, the arbitration section, is unenforceable because of unconscionability.
 III.
In Layne v. Garner, 612 So.2d 404 (Ala. 1992), we explained:
 "Although Alabama law lacks an explicit standard for determining whether a contract or contractual provision is unconscionable, case law reveals that four factors are important in making this determination.
 "In addition to finding that one party was unsophisticated and/or uneducated, a court should ask (1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract. See, Advertiser Co. v. Electronic Engineers, 527 So.2d 1317 (Ala.Civ.App. 1988); Crestline Center v. Hinton, 567 So.2d 393 (Ala.Civ.App. 1990); Lloyd v. Service Corp., 453 So.2d 735, 739 [(Ala 1984)]; and Wilson v. World Omni Leasing, Inc., 540 So.2d 713, 717 [(Ala. 1989)]."
612 So.2d at 408. See generally, Broemmer v. Abortion Servicesof Phoenix, Ltd., 173 Ariz. 148, 840 P.2d 1013 (Ariz. 1992) (provisions requiring a 21-year-old recipient of abortion services to arbitrate her malpractice claims against an abortion provider before a "licensed obstetrician/gynecologist" were unconscionable);Patterson v. ITT Consumer Financial Corp., 14 Cal.App.4th 1659,18 Cal.Rptr.2d 563 (1993), cert. denied, 510 U.S. 1176 (1994) (arbitration provisions in loan agreements requiring California consumers to arbitrate in Minnesota were unconscionable).
In holding that the arbitration provisions were unconscionable, the trial court in the present case focused on the second and fourth Layne
factors, stating:
 "[T]he language in the arbitration clause in this case is unique in that it states `You agree that the following types of matters will not be arbitrated. This means that neither one of us can require the other to arbitrate . . . any claim where we seek damages or other relief because of your default under the terms of the credit transaction. . . .' (Emphasis added.) This provision in the arbitration agreement in essence allows the Defendant to either seek arbitration as to `any claim and any claim where we seek damages or other relief. . . .' It is the opinion of this court that this *Page 897 
provision creates an unconscionable provision allowing the Defendant to have the option to address its problems with this credit transaction in either a court of law or through arbitration but denies the Plaintiff a like remedy. This language goes too far and these terms, in the opinion of this court, are unconscionable, one-sided, and [create] a provision that a fair-minded, rational thinking person would not voluntarily enter into."
(Emphasis in original.)
The trial court perceived the provisions as decidedly one-sided. However, an examination of the pertinent arbitration provisionsas a whole presents a different picture. For example, the Disclosure Statement provides:
 Claims Excluded from Arbitration. You [Borrower] agree that the following types of matters will not be arbitrated. This means that neither one of us can require the other to arbitrate:
"Any action to effect a foreclosure;
 "Any action to obtain possession of any property securing the Credit Transaction;
 "Any action for prejudgment injunctive relief or appointment of receivers(s);
 "Any claim where We [the Lender] seek damages or other relief because of Your default under the terms of the Credit Transaction;
 "Any lawsuit where all of the parties seeking monetary damages agree to accept in the aggregate $20,000 or less in total damages (compensatory and punitive) costs, and fees."
(Emphasis added.) Thus, according to the express terms of the contract, the appellants could not compel Leggett to arbitrate her claims if she sought no more than $20,000 "in total damages (compensatory and punitive) costs, and fees."
In Leggett's Brief in Support of Motion to Remand, filed in the United States district court, she acknowledged that the "members of the [Hughes] class action with claims similar to [hers were] receiving . . . a settlement that is well below $75,000.00 to each plaintiff class member individually." In that connection, Commercial and American Health state that "this case stems from Leggett's decision to opt out of a proposed class action settlement wherein she was due to be granted benefits in the amount of $8.60; i.e., the difference between the `gross' credit life insurance premium and the `net' credit life insurance premium ($46.22 and $37.62)." Brief of Appellants, Commercial CreditCorporation and American Health and Life Insurance Company, at 23.[1]
Thus, they contend: "The only reason that arbitration is an issue in this case is due to Leggett's decision to seek damages which have no *Page 898 
reasonable relation to the actual economic damages at issue."Id. at 22-23.
Commercial and American Health contend that, because of the $20,000threshold provision, any disparity between the relative remedies available to the parties lies more in perception than in reality. This is so, they contend, because the "total payments on the loan [amounted to less than] $3,000." Id. at 22. Thus, they point out, had Leggett
sued them for any amount equal to, or less than, the amount they could have sought from her in damages for defaulting on the note, herclaims would also have been justiciable. We agree with these contentions. Because of the $20,000 threshold, the arbitration provisions are not as one-sided as they appeared to the trial court.
Moreover, the suggestion in Leggett's affidavit that the cost of arbitration might be so high as to deprive her of a forum in which to resolve her claims is similarly overstated. This is so, because the Disclosure Statement provided:
 "Costs. The cost of any arbitration proceeding shall be divided as follows:
 "The party requesting the arbitration proceeding shall pay to the Arbitrator the amount of $125.00 when the demand for arbitration is made.
 "We will pay to the Arbitrator all other costs for the arbitration proceeding up to a maximum of one day (eight hours) of hearings.
 "All costs of the arbitration proceeding that exceed one day of hearings will be paid by the non-prevailing party.
 "In the case of an appeal, the appealing party will pay the cost of filing an appeal. The non-prevailing party shall pay all costs, fees, and expenses of the appeal proceeding and, if applicable, shall reimburse the prevailing party for the cost of filing an appeal.
 "Each party shall pay his/her own attorney, expert, and witness fees and expenses, unless otherwise required by law."
(Emphasis added.)
It is difficult to see how a party who truly believes she has a meritorious cause of action can view these provisions as particularly onerous. Leggett would initially have to pay only $125.00 to commence the process. Subsequently, the defendants would pay for the first day of proceedings, regardless of the outcome. The losing party would then pay for the remainder of the proceedings. In fact, the only parties disadvantaged by these cost provisions are the losing partieswhoever they might be.
In short, these arbitration provisions are not "unreasonably favorable to [the defendants]," nor are they "oppressive, one-sided, or patently unfair."Layne, 612 So.2d at 408. Thus, of the four unconscionability elements set out in Layne, the two most relevant elements are not satisfied. We conclude, therefore, that these arbitration provisions are not unconscionable under the facts of this case.
 IV.
We have considered other arguments raised by Leggett in support of the trial court's denial of the motions to compel arbitration. We find no basis in them for upholding the trial court's order. The order of the trial court is reversed and this cause is remanded.
REVERSED AND REMANDED.
Hooper, C.J., and See, Lyons, and Brown, JJ., concur.
Maddox and Houston, JJ., concur in part and concur in the result in part.
[1] Leggett does not refute these monetary figures, and they appear consistent with the terms of the Hughes settlement agreement, which provided in pertinent part:
 "Under the terms of the settlement, each Class Member will be entitled to receive benefits using the following formula:
 "(1) For each Class Member, the total amount of Premium Credits applicable to Contracts entered into on or after July 25, 1994, shall be aggregated. The total amount of Premium Credits applicable to such Contracts for each Class Member shall be denominated as said Class Member's `total Class A Premium Credit.' As used herein, the term `Premium Credit' equals the `actual earned premium' less the `net earned premium.' The `actual earned premium' for such Contract shall be defined as and shall consist of the amount of the credit life insurance premium shown on the face of said Contract as having been charged to the Class Member, less any rebates of unearned premium resulting from an early payment or refinancing of said Contract. The `net earned premium' for any Contract shall consist of the amount of the premium which would result from applying the formula approved by the State of Alabama Insurance Department for credit life insurance policies where the initial coverage amount is equal to the Amount Financed, and applicable to the period of time during which said Contract was made, less any rebates which would have been made based on the early payment or refinancing of such Contract."