HARWOOD, Justice.
Betty Gardner petitioned for a writ of certiorari to review the Court of Civil Appeals’ judgment affirming the trial court’s judgment as a matter of law for State Farm Mutual Auto Insurance Company, Inc., and other defendants (hereinafter re *1212 ferred to jointly as “State Farm”). We granted her petition to review the alleged error she claims was made by the trial court and the Court of Civil Appeals. We affirm.
The Court of Civil Appeals summarized the pertinent facts as follows:
“In 1986, after being employed for almost 20 years in various positions in State Farm’s regional office, Gardner accepted a job as a State Farm insurance sales agent; she and State Farm executed an agreement setting forth the pertinent terms between the parties. The ‘Agent’s Agreement’ that Gardner executed was terminable at will by either party upon written notification. State Farm directed Gardner to operate a State Farm agency in Jemison. Her business grew steadily until 1996. Although her general business had grown, her losses on automobile policies were high, according to State Farm guidelines.
“In 1996, State Farm implemented a ‘Management for Quality/High Priority Program,’ to address a problem that had come to its attention pertaining to excessive company losses under the automobile policies. Agents who met any one of three criteria were placed in the ‘High Priority Program.’ One of the criteria that identified agents for enrollment in the program was an indication that their sales of automobile policies had not been profitable over three of the last five years. A second criterion targeted agents whose cumulative total automobile policy losses to the company over the previous five years had exceeded $500,000. The final criterion identified agents who had not earned a minimum of 40 honor points out of a possible 100 points based in large part upon nonca-tastrophic automobile loss ratios. Gardner met all three of these criteria and was one of 12 agents in Alabama who were enrolled in the program.
“An ‘Action Plan’ was created to assist these agents in reducing their losses. Gardner voluntarily executed the Action Plan, which consisted of three basic requirements. First, she was required to submit all automobile-insurance applications and renewals through an assigned underwriter. Second, she was required to personally produce all applications for automobile policies, as opposed to delegating that task to a licensed staff person. Finally, Gardner was required to take two photographs of the automobiles listed to be insured and to submit the pictures to State Farm along with the application.
“Gardner claimed that this Action Plan hindered her efforts to cultivate new business, but the testimony presented demonstrated that the plan produced few changes in her business practices. Gardner did not have a licensed person on her staff who was qualified to produce applications; therefore, the requirement that she personally produce applications would not have significantly impacted this aspect of her business. Gardner testified, however, that before the implementation of the Action Plan, she had expedited the production of applications by dictating the contents of the application to a clerical person who had input the information into the computer.
“The requirement that Gardner be assigned to a specific underwriter would not have affected her business practices, because all State Farm agents were already assigned to a particular underwriter.
“The only significant additional duty the Action Plan imposed upon Gardner was the requirement that she obtain two photographs of the vehicles to be in *1213 sured and submit those photographs to the company along with the application. This additional duty did not appear, to impose an undue burden on Gardner, because every State Farm agent was already required to personally inspect the vehicle that was being insured, before submitting an application for automobile coverage. Those agents enrolled in the Action Plan were required to obtain photographs during their inspection of the vehicle. The purpose of having the photographs made was to help the agents reduce their losses by avoiding claims for previous, prepolicy damage.
“The testimony is disputed about how well Gardner complied with the requirements of the Action Plan. Gardner and her grown daughter, who at one time had worked for her in the agency, testified that they strictly complied with the additional requirements, but they claimed that State Farm habitually lost items, such as pictures and applications, that were mailed to it and repeatedly asked for the items to be resent. State Farm executives testified that Gardner failed to fully comply with the plan and that State Farm personnel were repeatedly forced to contact Gardner to seek additibnal required information in order to process applications. Because of Gardner’s alleged failure to comply with the Action Plan, State Farm withdrew, for a period of 30 days, Gardner’s privilege to unilaterally bind State Farm automobile insurance without prior underwriting approval. Gardner allegedly continued to fail to comply with the Action Plan, and State Farm restricted her from submitting any new business for an approximate nine-month period.
“Compliance with the Action Plan was designed to effectively reduce an agent’s losses. After Gardner had participated in the program for a period of 12 months, her losses had been reduced to a satisfactory level and she was removed from the High Priority Program.
“In January 1997, Gardner discovered that several insurance applications were missing on insurance policies she had bound. Michael Matlock, 'vice president of agency for State Farm, was assigned to assist Gardner in locating these missing applications. Pursuant to the terms of the ‘Agent’s Agreement,’ the applications were State Farm’s property.
“Robert West, regional vice president of State Farm, testified that State Farm considered it a serious matter when an application was lost. He explained that the company had a policy of allowing the agent to ‘bind’ coverage, immediately upon receipt of the customer’s premium payment, for a period of 90 days. He stated that once the coverage was ‘bound,.’ the agent was responsible for immediately forwarding the application to the company. ° West testified that the underwriting department would review the applications once they arrived and determine whether State Farm would insure against the risk. West explained that an inordinate delay between the time when the coverage was ‘bound’ and the time when the carrier reviewed the application to verify that it would accept the risk could be very detrimental to the company. He explained that if an application was not immediately delivered to the company, then the underwriting department was precluded from promptly evaluating the application and determining whether the risk to be insured against was within the acceptable guidelines. He stated that this delay could interfere with the company’s ability to send timely cancellation notices to customers whose risk did not fall within the acceptable limits and would thereby obligate. the company to provide coverage. for risks that did not meet its criteria. *1214 West emphasized that because of the serious consequences that could result when an application was lost, State Farm was making every possible effort to ensure that Gardner’s missing applications were located.
“Matlock arrived at Gardner’s office on February 3, 1997, to review Gardner’s files and to search for the missing applications. Upon his arrival, he learned that Gardner had implemented a ‘paperless’ system, by entering data from her files into a computer, and had disposed of all of her files in the city landfill. Gary Hazzard, deputy regional vice president for State Farm, and West both testified that they suspected that Gardner had deliberately disposed of her files in order to ‘cover up’ certain mistakes she had made.
“West testified that, after learning that the files had been destroyed, State Farm representatives met frequently with Gardner to review applications stored at her agency. According to Gardner, the tone at these meetings was acrimonious and hostile. Gardner testified that she felt berated by the State Farm representatives at these meetings, and she ultimately refused to participate in any further meetings. Upon learning of Gardner’s refusal to attend any further company meetings, State Farm notified Gardner in writing of her termination. Gardner requested a review of her termination, as contemplated by the Agent’s Agreement. The Review Committee met on September 21, 1998, and unanimously recommended that Gardner’s termination be upheld.
“Gardner sued State Farm and three executives of State Farm who had lived in Alabama during the relevant period. In her complaint, Gardner claimed breach of contract, intentional interference with a business relationship, defamation, fraudulent misrepresentation, fraudulent suppression, conspiracy, the tort of outrage, and conversion. Gardner later amended her complaint to add 22 additional officers and directors as defendants.
“On September 15, 1999, the trial court entered a summary judgment in favor of one of the State Farm executives. Thereafter, the remaining defendants moved for a summary judgment on the breach-of-contract claim; the trial court reserved its ruling on this motion. Immediately preceding the trial of the case, Gardner dismissed all of her claims for damages for mental anguish. The case was tried to a jury on March 13, 2000. After Gardner had presented her case, the remaining defendants moved for a JML [judgment as a matter of law] on all claims. The trial court granted this motion on all claims as to all defendants, with the sole exception of the breach-of-contract claim against State Farm. At the close of the evidence, State Farm moved for a JML on Gardner’s claim alleging breach of contract. The trial court denied that motion. The breach-of-contract claim was submitted to the jury and the jury returned a verdict in favor of Gardner in the amount of $186,000, and, on March 21, 2000, the trial court entered a judgment on that verdict. On March 28, 2000, State Farm renewed its motion for a JML, pursuant to Rule 50(b), Ala. R. Civ. P.
“On June 20, 2000, the trial court set aside its judgment on the jury verdict and entered a JML on Gardner’s breach-of-contract claim against State Farm. As grounds for its JML, the trial court stated that it had reviewed the ‘Agent’s Agreement’ Gardner had executed with State Farm and had concluded that the contract was terminable at will. In its judgment, the trial court *1215 further stated that, in accordance with Rule 50(c)(1), Ala. R. Civ. P., it conditionally granted State Farm’s motion for a new trial, in the event the JML was subsequently vacated or reversed.”
Gardner v. State Farm Mut. Auto. Ins. Co., 822 So.2d 1201, 1203-06 (Ala.Civ.App.2001) (footnotes omitted).
The record contains a copy of the “Agent’s Agreement” that Gardner alleged State Farm had breached. That Agent’s Agreement states, in pertinent part:
“SECTION III — TERMINATION OF AGREEMENT
“A. This Agreement will terminate upon your death. You or State Farm have the right to terminate this Agreement by written notice delivered to the other or mailed to the other’s last known address. The date of termination shall be the date specified in the notice, but in the event no date is specified, the date of termination shall be the date of delivery if the notice is delivered, or the date of the postmark, if the notice is mailed. Either party can accelerate the date of termination specified by the other by giving written notice of termination in accordance with this paragraph.
“B. In the event we terminate this Agreement, you are entitled upon request to a review in accordance with the termination review procedures approved by the Board of Directors of the Companies, as amended from time to time.
[[Image here]]
“SECTION VI — GENERAL PROVISIONS
[[Image here]]
“E. This Agreement constitutes the sole and entire Agreement between the parties hereto, and no change, alteration, or modification of the terms of this Agreement may be made except by agreements in writing signed by an authorized representative of the Companies and accepted by you.”
Gardner argues that the interplay between the termination-notice provision, in provision A, and the termination-review provision, in provision B, created an ambiguity in the Agent’s Agreement as to whether she could be terminated without cause, and that extrinsic evidence showed that State Farm did not represent, nor did Gardner understand, that the agreement allowed for her to be terminated at State Farm’s .will. She therefore argues that the trial court erred in determining that the Agent’s Agreement was not ambiguous, and that the Court of Civil Appeals erred in affirming that judgment.
Our standard of review of a judg.ment as a matter of law is settled:
“ ‘The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now renamed preverdict and postverdict motions for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court’s ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court,' we must view any evidence most favorably to the non-mov-ant.’ ”
Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala.1998) (quoting Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988)).
The trial court determined that the agreement was not ambiguous and that State Farm was due a judgment as a matter of law, in an order that, in pertinent part, stated:
*1216 “State Farm argues that [the termination-notice provision] unambiguously gives it the right to terminate the Agreement upon written notice at any time with or without cause, citing decisions from other jurisdictions construing this identical language. Melnick v. State Farm Mutual Automobile Insurance Co., 106 N.M. 726, 749 P.2d 1105 (1988), cert. denied, 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988); Mooney v. State Farm, 344 F.Supp. 697, 699-700 (D.N.H.1972).
“Whether a contract is ambiguous is a question of law for the trial court, and if a contract is unambiguous, then parol evidence is not admissible to vary the terms of the agreement. Commercial Credit Corp. v. Leggett, 744 So.2d 890, 893-[94] (Ala.1999); Environmental Systems, Inc. v. Rexham Corp., 624 So.2d 1379, 1381 (Ala.1993). The Court concludes that this provision unambiguously provides that State Farm had the right to terminate the Agent’s Agreement upon written notice at any time, with or without cause. At-will contracts ‘may be terminated by either party with or without cause or justification.’ Smith v. Reynolds Metals Co., 497 So.2d 93, 95 (Ala.1986). In two cases substantially similar to this one, the Supreme Court held that an insurance company did not breach its contract with an agent by terminating the contract, where the agency agreement at issue was terminable at the will of either party. Salter v. Alfa Ins. Co., Inc., 561 So.2d 1050, 1051-53 (Ala.1990); Bosarge v. Bankers Life Co., 541 So.2d 499, 500-[01] (Ala.1989).
“Since it is undisputed that State Farm provided written notice of termination to Gardner and since the Agent’s Agreement unambiguously provides that either party may terminate it at any time with or without cause, State Farm is due judgment as a matter of law on the claim that it violated the Agent’s Agreement by terminating it.”
While the trial court’s order failed explicitly to address the issue of how the termination-review provision might relate to the termination-notice provision, the Court of Civil Appeals addressed both provisions, stating:
“Gardner argues that State Farm’s elaborate termination-review procedure was inconsistent with the termination-at-will provision and thus made that provision of the Agent’s Agreement ambiguous. A similar argument was advanced in Burrell v. Carraway Methodist Hosps. of Alabama, Inc., 607 So.2d 193 (Ala. 1992). In Burrell, a discharged employee claimed that his employer had ‘represented by its practice’ that he could be terminated only for cause. 607 So.2d at 195. Rejecting this claim, our supreme court held that when an employer institutes a general procedure designed to eliminate arbitrary terminations, this conduct does not divest it of its status as an ‘at will’ employer. Burrell, 607 So.2d at 195. Following the rationale set forth in Burrell, we conclude that the termination-review procedure provided for in the Agent’s Agreement was not inconsistent with the provision stating that the agreement was terminable at will.”
822 So.2d at 1208.
The rationale the Court of Civil Appeals relied upon from this Court’s decision in Burrell v. Carraway Methodist Hospitals of Alabama, Inc., 607 So.2d 193 (Ala.1992), is not fully dispositive of the issue Gardner presents. No written agreement was involved in Burrell; rather, the plaintiff in that case alleged the breach of an oral agreement that could be terminated only for cause, asserting that the agreement arose out of the “general behavior” of his employer. This Court reasoned that the *1217 circumstances relied on by the plaintiff had created nothing more than “a general, de facto policy” which could have given rise to nothing more than a “mere expectation,” as opposed to an enforceable contract. “The only representation of any sort indicated by the record in regard to cause for termination is found in Burrell’s employee handbook, which states that he may be terminated with or without cause.” 607 So.2d at 196 n. 3. In the present case, we consider the effect of a termination-review procedure that was explicitly provided for by a provision of the written Agent’s Agreement.
In light of the consideration that both the trial court and the Court of Civil Appeals gave to Gardner’s argument that the Agent’s Agreement was not conclusively a contract of “employment at will” because of the inclusion of the termination-review provision, we address that issue directly. This Court has stated:
“ “Whether a contract is ambiguous is a question of law for the trial court to determine.’ P & S Business, Inc. v. South Central Bell Tel. Co., 466 So.2d 928, 931 (Ala.1985) (citing Haddox v. First Alabama Bank of Montgomery, 449 So.2d 1226, 1228 (Ala.1984); Food Service Distributors, Inc. v. Barber, 429 So.2d 1025, 1028 (Ala.1983)). In interpreting a contract, the ‘ “words of the agreement will be given their ordinary meaning.” ’ Hibbett Sporting Goods, Inc. v. Biernbaum, 391 So.2d 1027, 1029 (Ala.1980) (quoting Flowers v. Flowers, 334 So.2d 856, 857 (Ala.1976)). An ‘instrument is unambiguous if only one reasonable meaning clearly emerges.’ Vainrib v. Downey, 565 So.2d 647, 648 (Ala.Civ.App.1990); see also Flowers, 334 So.2d at 857. ‘If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury.’ McDonald v. U.S. Die Casting & Development Co., 585 So.2d 853, 855 (Ala.1991) (citations omitted).”
Reeves Cedarhurst Dev. Corp. v. First Amfed Corp., 607 So.2d 184, 186 (Ala.1992).
The termination-notice provision in the Agent’s Agreement states that the agreement may be terminated at any time by either Gardner or State Farm simply delivering notice to the other. The language in that provision places no limit on the agent’s or State Farm’s ability to terminate the employment relationship. As the Court of Civil Appeals correctly recognized, “Alabama has a well-established ‘employment-at-will’ doctrine, under which an employer may terminate an employee at its discretion, if no provision in the employment contract provides for a specific term of employment or sets forth terms and conditions for dismissal.” Gardner, 822 So.2d at 1207 (citing Burks v. Pickwick Hotel, 607 So.2d 187 (Ala.1992)).
Furthermore, in Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725, 728 (Ala.1987), this Court stated:
“By now, the rule is well settled in Alabama that an employee contract at will may be terminated by either party with or without cause or justification. See, e.g., Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala.1984); Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977). This means a good reason, a wrong reason, or no reason. Hinrichs, supra.”
This Court has also followed this general rule in the context of similar insurance agent agreements. See Bosarge v. Bank *1218 ers Life Co., 541 So.2d 499 (Ala.1989); and Salter v. Alfa Ins. Co., Inc., 561 So.2d 1050 (Ala.1990).
Whether, the presence of a termination-review procedure changes the “at-will” nature of an employment contract, or more specifically in this case, the Agent’s Agreement, has not been directly considered by this Court. We note that other courts interpreting similar State Farm agent agreements have determined that such agreements provide for termination at will. See Mooney v. State Farm Ins. Cos., 344 F.Supp. 697 (D.N.H.1972); and Melnick v. State Farm Mutual Auto. Ins. Co., 106 N.M. 726, 749 P.2d 1105 (1988).[1] The Nevada Supreme Court recently discussed this exact issue in Kaldi v. Farmers Insurance Exchange, 117 Nev. 273, 21 P.3d 16 (2001). That Court stated:
“Kaldi contends that it was error for the district court to dismiss his cause of action for breach of contract because the Agreement expressly required Farmers to establish good cause before terminating his agency. Kaldi alleges that the presence of provision ‘D,’ which provides for review of a termination by a review board, and the absence of an ‘at-will’ provision, create a contractual obligation to allow termination of the Agreement for good cause only. We disagree.
“Absent a contractual provision to the contrary, an independent contractor/principal agency relationship is terminable at any time at the will of the principal or the agent. See generally Restatement (Second) of Agency § 117 cmt. a (1958)....
“Provision ‘C’ of the Agreement contains contractual language that modifies the common law and statutory right of the parties to terminate the agency relationship at will. This language, however, deals with the type of notice required before a termination becomes effective .... The contractual provisions do not limit the principal’s right to terminate the agency without cause. Provision ‘C’ is clear on its face and must be interpreted as written; it does not require Farmers to have good cause before terminating the agency relationship.
“Kaldi does not contest that the language of provision ‘C’ is not clear on its face. Instead, Kaldi argues that provision ‘C’ is modified by provision ‘D’ of the Agreement. Provision ‘D’ provides that ‘[i]n the event this Agreement is terminated by the Companies, the Agent may within ten (10) days of receiving notice of termination request a review of the-termination by a termination review board.’ Kaldi contends that this provision can be reasonably interpreted to require a showing of good cause prior to termination because a review by the Board would be meaningless in the case of a termination without cause.
‘(While provision ‘D’ unambiguously provides for a review of the agent’s termination, it does not indicate that the review is to establish the existence or absence of good cause. It merely provides a forum for arguing that the decision to end the agency agreement should be reconsidered. The ultimate decision on whether or not to terminate the agency still resides within the discretion of the principal. Provision ‘D’ cannot be *1219 reasonably read to require Fanners to establish good cause before terminating the Agreement.
“This interpretation does not, as asserted by Kaldi, lead to an absurd result or render meaningless the language of provision ‘D.’ Kaldi contends that the only logical reason for a review is to determine if there is good cause to terminate the agent. However, there are many reasons why a principal may wish to terminate an agency relationship that have nothing to do with wrongful conduct on the part of the agent. For example, there may be too many agents in a given geographical area and the principal may simply have chosen to reduce the agency pool.
“The review board process gives the agent the opportunity to assert that it is not in the best interest of Farmers to sever the agency relationship. It also gives the agent, in appropriate circumstances, a forum in which to argue that the termination was the product of bias or prejudice on the part of the person who made the initial decision to terminate the relationship. That is, the termination was not made to further the interests of Farmers, but the interests of the executive who made the decision. Thus, even without a requirement of cause, the review board serves a viable purpose under the contract.”
117 Nev. at -, 21 P.3d at 20-21.
We find the Nevada Supreme Court’s analysis of this issue persuasive. Furthermore, the Texas Court of Appeals similarly concluded that the presence of a termination-review procedure did not change the “at-will” nature of a termination-notice provision in Threadgill v. Farmers Insurance Exchange, 912 S.W.2d 264 (Tex.Ct. App.1995). In light of the strong general support for the concept of “employment at will” in this State, see Burks, supra, and Hoffman-La Roche, supra, and the rationale expressed by our sister states when addressing this exact issue, we conclude that the availability of a termination-review provision, in the context of this case, did not change the “at-will” character of the Agent’s Agreement as a contract of employment. The judgment of the Court of Civil Appeals, affirming the judgment as a matter of law for State Farm, is therefore affirmed.
AFFIRMED.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur.

. While the Court of Civil Appeals relied on the United States District Court for the Northern District of Alabama's interpretation of a similar State Farm agent agreement in Ventress v. State Farm Ins. Cos., (No. CV-99-B-1925-S) (N.D.Ala., September 18, 2000) (not reported in F.Supp.), the United States Court of Appeals for the Eleventh Circuit vacated that judgment on May 30, 2001, based upon its conclusion that the plaintiffs lacked standing.