872 A.2d 735

**David G. WALTHER, et ux.**

v.

**SOVEREIGN BANK.**

**No. 61, Sept. Term, 2004.**

Court of Appeals of Maryland.

April 20, 2005.

Bell, C.J., dissented and filed opinion in which Greene, J., joined.

414

E. David Hoskins (the Law Office of E. David Hoskins, L.L.C., Baltimore, MD), on brief, for petitioners.

James W. Bentz (Thomas L. Allen, Roy W. Arnold and John M. McIntyre of Reed, Smith, L.L.P., Pittsburgh, PA; Gerald J. Gaeng and Andrew H. Baida of Rosenberg, Martin, Funk & Greenberg, L.L.P., Baltimore, MD), all on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, Judge.

This case involves the enforceability of an arbitration agreement entered into as part of a second mortgage loan contract between David and Tamera Walther, petitioners, and Sover-

eign Bank, the assignee of the loan contract and respondent in the case at bar.

Petitioners present two questions for our review, which we rephrase for the sake of clarity as follows:

I. Is an arbitration clause contained in a "Direct Loan Note & Truth in Lending Disclosures" agreement between petitioner and a lender unconscionable and therefore unenforceable?

II. Did respondent waive the arbitration clause when it sought dismissal on the merits in addition to seeking an order to compel arbitration?

For the reasons discussed herein, we hold that the arbitration clause at issue is not unconscionable but is part of an enforceable agreement validly entered into by petitioners for the purpose of securing a second mortgage loan. We also hold that Sovereign Bank's action of seeking dismissal on the merits did not amount to a waiver of its right to arbitrate petitioners' claims against it.

## I. Facts

On or about February 17, 1998, petitioners obtained a secondary mortgage loan [1] (the "Mortgage Loan") from an entity known as Empire Funding Corporation ("Empire"). The Mortgage Loan principal was $33,000.00 and it was secured by a lien on petitioners' residence. Under the terms of the Mortgage Loan agreement, petitioners were required to pay: a flood certificate fee of $12.00; an underwriting fee of $125.00; a settlement fee of $200.00; a title binder fee of

---

1. Maryland Code (1975, 2000 Repl. Vol.), § 12–401(i) of the Commercial Law Article defines a secondary mortgage loan as follows:

"(i) *Secondary mortgage loan.*—(1) 'Secondary mortgage loan' means a loan or deferred purchase price secured in whole or in part by a mortgage, deed of trust, security agreement, or other lien on real property located in the State, which property:

(i) Is subject to the lien of one or more prior encumbrances, except a ground rent or other leasehold interest; and

(ii) Has a dwelling on it designed principally as a residence with accommodations for not more than four families."

$125.00; a document preparation fee of $125.00; an administrative fee of $230.00; a credit fee of $20.00; a courier fee of $30.00; and a mortgage broker fee of $1,980.00.

As part of the Mortgage Loan transaction, petitioners signed a "Direct Loan Note & Truth in Lending Disclosure" (the "Disclosure Agreement"), which contained, *inter alia,* an agreement to arbitrate. That specific part of the Disclosure Agreement provided:

> "**BINDING ARBITRATION.** The parties agree that any claim, dispute or controversy arising from or relating to this agreement or the relationships which result from this agreement, including the validity of this arbitration clause[2] or the entire agreement, shall be resolved by binding arbitration by and under the Code of Procedure of the National Arbitration Forum in effect at the time the claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1–16. Judgment upon the award may be entered in any court having jurisdiction. Nothing in this agreement shall be construed to limit the right of any party to 1) foreclose against real or personal property or other security by an exercised power of sale under a security instrument or applicable law, 2) exercise self-help remedies, or 3) obtain provisional or ancillary remedies with regard to such securi-

---

**2.** We note that, although the arbitration clause at issue provides that any claim relating "to the validity of this arbitration clause ... shall be resolved by arbitration," where the validity of an arbitration clause itself is directly in dispute, the dispute is to be resolved by the courts and not the arbitrator. *Cf. Allstate Insurance Co. v. Stinebaugh,* 374 Md. 631, 644, 824 A.2d 87, 95 (2003) (stating that where the "validity of the arbitration clause itself was *not in dispute,* the dispute was for the arbitrator") (emphasis added) (citing *Holmes v. Coverall North America, Inc.,* 336 Md. 534, 547, 649 A.2d 365, 371 (1994)). *See also Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.,* 313 Md. 652, 661, 547 A.2d 1048, 1052 (1988) (stating that "the final determination of whether a valid contract to arbitrate existed between the parties *must be made by a court,* not an arbitrator") (emphasis added). Because petitioners allege unconscionability as to the arbitration clause itself, the issue is properly before the courts.

ties, including without limitation, injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a Court having competent jurisdiction before, during or after the pendency of any arbitration. The pursuit of any such remedy shall not constitute a waiver of the right of any party to have all other claims or disputes resolved by arbitration. The parties agree that any dispute subject to arbitration shall not be adjudicated as a class action or consolidated class proceeding. By signing this agreement, the parties acknowledge that they had a right or opportunity to litigate disputes through a court, but that they preferred to resolve any disputes through arbitration. The parties acknowledge that they are waiving their right to jury trial by consenting to binding arbitration." [Footnote added.]

At some time after the loan documents were signed, Empire assigned the note to its current holder and respondent in the case at bar, Sovereign Bank.

On December 23, 2002, petitioners filed a "Class Action Complaint and Demand for Jury Trial" in the Circuit Court for Baltimore County, alleging that Empire had violated the Maryland Secondary Mortgage Loan Law (the "SMLL"), Md. Code (1975, 2000 Repl. Vol.), §§ 12–401 et seq. of the Commercial Law Article, by charging petitioners $2,847.00 in illegal fees.[3] Petitioners' "prayer for relief" included a "refund" of "the amount of all interest and illegal fees already paid on the notes," asserting that they were entitled to a $2,847.00 refund, plus any interest that they had paid to that date, an amount they claimed to be "$22,341.50 plus an additional $386.39 per month from the date of filing this Complaint until the date Judgment is entered." As stated, petitioners sought class-action status from the circuit court, believing there to be "hundreds of members" that had similarly been aggrieved by "predatory lending practices" relating to secondary mortgage loans sold or assigned to Sovereign Bank.

---

**3.** This figure being the sum of the aforementioned fees that Empire required petitioners to pay pursuant to the Mortgage Loan transaction.

On March 10, 2003, Sovereign Bank responded to petitioners' complaint by filing in the circuit court a "Petition to Compel Arbitration and Motion to Dismiss or to Stay Proceedings." In its petition and supporting memorandum, Sovereign Bank stressed the fact that the Disclosure Agreement contained the aforementioned arbitration clause, which it argued made petitioners' claims subject to mandatory arbitration. Sovereign Bank also pointed out in its memorandum in support of its petition that petitioners explicitly had waived both their right to a class-action adjudication and their right to a jury trial by their action of signing the Disclosure Agreement.

On March 27, 2003, petitioners filed a memorandum in opposition to Sovereign Bank's petition and motion. In an affidavit filed with the memorandum, Mr. Walther claimed, *inter alia,* that he did not know that the Mortgage Loan included the charges at issue and that he "had no opportunity to review the" Disclosure Agreement "beyond a cursory perusal" before signing it, but that, "[h]ad I realized how [the arbitration clause] effected [sic] my rights to a jury trial and to bring any future claim relating to the loan as part of a class action, I would not have signed the document" (alteration added). Mr. Walther explained that "[a]t the closing, no one explained to me the full content of the agreement I was signing. In fact, a loan officer present at the closing urged me to sign what was 'a usual and standard' loan agreement. The agents of the lender who were present at the closing simply handed me a large stack of documents, showed me where to sign, and urged me to sign the documents."

On April 2, 2003, the circuit court entered an order granting Sovereign Bank's petition to enforce arbitration, providing that "the claim of [petitioners] against defendant Sovereign Bank is referred to arbitration in accordance with the loan agreement ..." (alteration added).[4] Petitioners thereafter timely appealed the decision to the Court of Special Appeals.

---

4. The Circuit Court's order apparently was also intended to stay the proceedings before the circuit court pending the outcome of the arbitration. *See* Md.Code (1974, 2002 Repl. Vol.), § 3–209(a) of the Court and

On May 26, 2004, the intermediate appellate court, in an unreported decision, found that "[t]he major issue to be decided in this case is whether an arbitration clause contained in a 'Direct Loan Note & Truth in Lending Disclosure' agreement between a lender and the appellants, David and Tamera Walther, is unconscionable." In holding that the arbitration clause was not unconscionable, the Court of Special Appeals stated that petitioners were "legally responsible for reading the contents of any loan they signed," that the arbitration clause was "not completely one-sided" in favor of Sovereign Bank, the arbitration clause's limitation as to class action proceedings was valid and enforceable, the arbitration clause's fee arrangement was not likely to be prohibitively expensive,

---

Judicial Proceedings Article (stating that "[a] court shall stay any action or proceeding involving an issue subject to arbitration if: (1) A petition for order to arbitrate has been filed; or (2) *An order for arbitration has been made"*) (emphasis added). It is clear that the circuit court did not seek to dismiss petitioners' claims. This is made evident by the fact that the Circuit Court judge crossed through a portion of the order, which was drafted by Sovereign Bank, that stated "this case is DISMISSED," thereby negating that provision of the order.

Although the proceedings before the Circuit Court have been stayed pending the outcome of the arbitration proceedings, the Circuit Court's order to compel arbitration constitutes a final judgment of the circuit court and is therefore immediately appealable. *See Brewster v. Woodhaven Bldg. & Dev., Inc.*, 360 Md. 602, 610, 759 A.2d 738, 742 (2000) (Judge Raker, writing for the Court, stating that "[i]t is well settled that an order need not necessarily dispose of the merits of a case to be a final judgment"); *see also Horsey v. Horsey*, 329 Md. 392, 402, 620 A.2d 305, 310 (1993) (stating that "a circuit court's order to arbitrate the entire dispute before the court does deprive the plaintiff of the means, in that case before the trial court, of enforcing the rights claimed. The order effectively terminated that particular case before the trial court. Thus, the order would clearly seem to be final and appealable"); *Rourke v. Amchem Products, Inc.*, 153 Md.App. 91, 106, 835 A.2d 193, 201 (2003), *aff'd*, 384 Md. 329, 863 A.2d 926 (2004) (stating that "[i]t is settled in Maryland ... that a circuit court's order removing a claim from that court to another—whether to a district court, another circuit court, *or to arbitration*—constitutes an immediately appealable final judgment on the *arbitrability question"*) (emphasis added). *Because all of the issues in this case were ordered to arbitration by the trial judge, there was nothing left for the trial judge to "stay." He compelled the entire case to arbitration. Under these circumstances, all of the issues are arbitrable and thus the case was effectively dismissed and the matter was immediately appealable under the cases above cited.*

the waiver of a jury trial by petitioners was valid and enforceable, and that Sovereign Bank had never waived its right to arbitrate because of any filing it had made in the circuit court. Petitioners thereafter petitioned this Court for Writ of Certiorari. On August 25, 2004, we granted the petition. *Walther v. Sovereign Bank,* 382 Md. 688, 856 A.2d 724 (2004).

## II. Standard of Review

A trial court's order to compel arbitration constitutes a final and appealable judgment. *See Horsey v. Horsey,* 329 Md. 392, 403, 620 A.2d 305, 310–11 (1993) (stating that "an order compelling the parties before the trial court to submit their dispute to arbitration, thereby denying all relief sought in the trial court and terminating the action there, is a final appealable judgment"); *see also Litton Bionetics v. Glen Constr. Co.,* 292 Md. 34, 437 A.2d 208 (1981).

Our role in reviewing the trial court's order to compel arbitration " 'extends only to a determination of the existence of an arbitration agreement.' " *Allstate Ins. Co. v. Stinebaugh,* 374 Md. 631, 645, 824 A.2d 87, 95 (2003) (quoting *Holmes v. Coverall North America, Inc.,* 336 Md. 534, 546, 649 A.2d 365, 370–71 (1994)). The trial court's conclusion as to whether a particular dispute is subject to arbitration is a conclusion of law, which we review *de novo. See Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250, 768 A.2d 620, 629–30 (2001) (stating, in a case concerning whether there existed a valid agreement to arbitrate, that "[t]he interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court").

## III. Discussion

### A. Is the Arbitration Agreement Unconscionable and Therefore Unenforceable?

Petitioners first ask us to decide whether the arbitration clause contained in the Disclosure Agreement is invalid because it is unconscionable and therefore unenforceable. Be-

cause the arbitration agreement states that it was "made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act," our examination therefore must necessarily begin with the Federal Arbitration Act (the "FAA"), which is set forth at 9 U.S.C. § 1 et seq. The FAA applies to nearly all arbitration agreements, and, like all federal law, it preempts inconsistent state law. *See Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984) (United States Supreme Court stating that, "[i]n creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements") (footnote omitted). Section 2 of the FAA, which the United States Supreme Court has made clear state courts are also bound to recognize and enforce, *see Southland,* 465 U.S. at 14–15, 104 S.Ct. at 860–61, provides that a "written provision . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon any grounds at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In enforcing § 2 of the FAA, however, state courts are not bound by the federal procedural provisions of the FAA, which are found in §§ 3 and 4 of the FAA, but may generally apply their own procedures. *See Southland,* 465 U.S. at 16 n. 10, 104 S.Ct. at 861 n. 10 (stating that, "[i]n holding that the [FAA] preempts a state law that withdraws the power to enforce arbitration agreements, we do not hold that §§ 3 and 4 of the [FAA] apply to proceedings in state courts") (alterations added). Therefore, in enforcing § 2 of the FAA, we must look to the pertinent Maryland law relating to arbitration agreements to decide whether the circuit court properly ordered petitioners to arbitrate their claims against Sovereign Bank in light of petitioners' assertion that the arbitration agreement itself is invalid in that it is unconscionable and therefore unenforceable.

The Maryland Uniform Arbitration Act ("MUAA") is set forth in Md.Code (1974, 2002 Repl. Vol.), §§ 3–201 et seq. of the Courts and Judicial Proceedings Article and was purpose-

fully meant to mirror the language of the FAA. In nearly identical language to that found in § 2 of the FAA, the MUAA provides that a "written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." Section 3–206(a) of the Courts and Judicial Proceedings Article. As we stated in *Holmes v. Coverall North America,* 336 Md. 534, 649 A.2d 365 (1994):

> "The Maryland Arbitration Act has been called the 'State analogue . . . to the Federal Arbitration Act.' *See Regina v. Envirmech,* 80 Md.App. 662, 667, 565 A.2d 693, 696 (1989). The same policy favoring enforcement of arbitration agreements is present in both our own and the federal acts. *Compare Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983) (noting the 'liberal federal policy favoring arbitration agreements') *with Gold Coast Mall,* 298 Md. at 103, 468 A.2d at 95 (noting the 'legislative policy favoring enforcement of executory agreements to arbitrate'). We therefore rely on decisions interpreting the Federal Arbitration Act in reaching our decision."

*Holmes,* 336 Md. at 541, 649 A.2d at 368. Judge Battaglia, for the Court, most recently explained arbitration's favored status in *Cheek v. United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 835 A.2d 656 (2003):

> "We have described arbitration as 'the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them.' *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 103, 468 A.2d 91, 95 (1983); *see also Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.,* 294 Md. 443, 448, 450 A.2d 1304, 1306 (1982). The Maryland Uniform Arbitration Act . . . 'expresses the legislative policy favoring enforcement of agreements to arbitrate.' *Allstate Ins. Co. v. Stinebaugh,* 374 Md. 631, 641, 824 A.2d 87, 93 (2003). *See also Holmes v. Coverall North America, Inc.,* 336 Md. 534, 546, 649 A.2d

365, 371 (1994) (observing that the Arbitration Act embodies 'the legislative intent to favor arbitration'); *Crown Oil & Wax Co. of Delaware, Inc. v. Glen Constr. Co. of Virginia, Inc.*, 320 Md. 546, 558, 578 A.2d 1184, 1189 (1990) ('Maryland courts have consistently stated that the [Arbitration Act] embodies a legislative policy favoring the enforcement of executory agreements to arbitrate.'); *Gold Coast Mall, Inc.*, 298 Md. at 103, 468 A.2d at 95; *Charles J. Frank, Inc.*, 294 Md. at 448, 450 A.2d at 1306."

*Cheek*, 378 Md. at 146, 835 A.2d at 660. This public policy favoring such agreements is understandable, as arbitration agreements are generally a less expensive and more expeditious means of settling litigation and relieving docket congestion. The favorable status which arbitration agreements are afforded in Maryland has been made explicitly evident by the Legislature in the enactment of the MUAA.

Under the MUAA, where a dispute arises concerning any aspect of an agreement that is alleged to be subject to an arbitration clause, § 3–207 of the Courts and Judicial Proceedings Article allows parties to petition a court to compel arbitration and states:

" § 3–207. **Order to arbitrate.**

(a) *Refusal to arbitrate.*—If a party to an arbitration agreement described in § 3–202 refuses to arbitrate, the other party may file a petition with a court to order arbitration.

(b) *Denial of existence of arbitration agreement.*—If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.

(c) *Determination by court.*—If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition."

■■ Whether a valid arbitration agreement exists in the case *sub judice* "depends on contract principles since arbitration is a matter of contract." *Cheek*, 378 Md. at 147, 835 A.2d at 661. The United States Supreme Court has stated that

"generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements...." *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996). Therefore, an arbitration agreement may be challenged on grounds of unconscionability, which petitioners do here.

An unconscionable bargain or contract has been defined as one characterized by "extreme unfairness," which is made evident by "(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." BLACK'S LAW DICTIONARY 1560 (8th ed. 2004). *See also* RE-STATEMENT (SECOND) OF CONTRACTS § 208 cmt. b (1981) (observing that, "[t]raditionally, a bargain was said to be unconscionable in an action at law if it was 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other' ") (citation omitted). One of the leading treatises on the law of contracts describes what is meant by unconscionability:

"The concept of unconscionability was meant to counteract two generic forms of abuses: the first of which relates to procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter the transaction; and the second of which relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having nothing to do with price or other central aspects of the transaction."

8 Richard A. Lord, *Williston on Contracts* § 18:10 (4th ed. 1998). The United States Court of Appeals for the Fourth Circuit also explained the particular characteristics of both procedural and substantive unconscionability in *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir.1989), stating:

> " 'Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract—"bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only our standard form"). Each of these branches of unconscionability has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.' "

*Id.* at 296 n. 12 (quoting James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 4–3, at 186 (3d ed. 1988)). *See also Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 181 (3d. Cir.1999) (referring to "procedural unconscionability" as "the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language" and "substantive unconscionability" as "contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent").

Petitioners contend that the arbitration clause contained in the Disclosure Agreement should be deemed unconscionable for three distinct reasons: (1) petitioners "had no meaningful choice about the arbitrations clause," (2) the arbitration clause is "unreasonably favorable to the lender and its assignee, Sovereign Bank," and (3) the arbitration clause "requires borrowers to pay excessive fees to have their claims heard" in an arbitral forum. Thus, they claim that there exists both procedural and substantive unfairness amounting to unconscionability in the Disclosure Agreement. We shall examine each of petitioners' contentions in turn.

### 1. *Procedural Unconscionability*

Petitioners initially contend that the arbitration agreement was procedurally unconscionable because they:

> "were provided no opportunity to review the [Disclosure Agreement] on the night of the closing and were provided no opportunity to review the [Disclosure Agreement] beyond a cursory perusal and, thus, never noticed or read [the arbitration clause]. Had [petitioners] realized how [the arbitration clause] altered their rights to a jury trial and to bring any future claim relating to a loan as a part of a class action, they would not have signed the [Disclosure Agreement]" [Alterations added.]

Petitioners' claim that they were oblivious as to the arbitration clause is specious at best. Of the seventeen separate paragraphs that constitute the entirety of the Disclosure Agreement signed by petitioners, only paragraph "17," the arbitration clause, has been underlined in the original agreement. Therefore, it has been made *conspicuously distinct* from the rest of the clauses in the Disclosure Agreement. *See* BLACK'S LAW DICTIONARY 329 (8th ed. 2004) (defining "conspicuous" as "[C]learly visible or obvious. Whether a printed clause is conspicuous as a matter of law [usually] depends on the size and style of the typeface. Under the UCC, a term or clause is conspicuous if it is written in a way that a reasonable person against whom it is to operate ought to notice it.") (alteration added). Furthermore, the arbitration clause is placed *directly above* petitioners' signatures, thereby weakening any argument that petitioners were not aware of its existence because it was buried somewhere within a voluminous contract. *See Commercial Credit Corp. v. Leggett,* 744 So.2d 890, 895 (Ala.1999) (Supreme Court of Alabama holding that arbitration provision was not unconscionable because the provision appeared in a conspicuous "boxed-in" section of the disclosure agreement and borrower affixed her signature *"directly beneath"* at the end of the arbitration provision); *see also Russell v. Performance Toyota, Inc.,* 826 So.2d 719, 726 (Miss.2002) (Supreme Court of Mississippi holding that arbi-

tration agreement between dealership and pickup truck buyer was not procedurally unconscionable where "arbitration agreement in the Purchase Agreement is preceded by boldface and capitalized headings and was almost immediately succeeded by the signature line").

■ As this Court stated in the case of *Merit Music Service, Inc. v. Sonneborn,* 245 Md. 213, 221–22, 225 A.2d 470, 474 (1967), "the law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms." *See also Vincent v. Palmer,* 179 Md. 365, 375, 19 A.2d 183, 189 (1941) (stating that, "as a general rule, when one signs a release or other instrument, he is presumed in law to have read and understood its contents, and he will not be protected against an unwise agreement"); *Owens v. Graetzel,* 149 Md. 689, 696, 132 A. 265, 268 (1926) (stating that parties to mortgage are bound by its terms and "must be held to know its meaning as thereby expressed"). In the nearly-century-old case of *Smith v. Humphreys,* 104 Md. 285, 65 A. 57 (1906), Judge Boyd expressed the Court's generally critical view of such defenses to the enforcement of a contract:

"Any person who comes into a Court of equity admitting that he can read, and showing that he has average intelligence, but asking the aid of the Court because he did not read a paper involved in the controversy, and was thereby imposed on, should be required to establish a very clear case before receiving the assistance of the Court in getting rid of such document. It is getting to be too common to have parties ask Courts to do what they could have done themselves if they had exercised ordinary prudence, or, to state it in another way, to ask Courts to undo what they have done by reason of their own negligence or carelessness."

*Id.* at 290–91, 65 A. at 59.

■ The stance that this Court took in *Humphreys* in regard to the justifiably difficult hurdle that a signatory to a contract must make before a court will rescind a contract

because of its unfair terms remains firm and is based on one of the most commonsensical principles[5] in all of contract law, *i.e.*, that a party that voluntarily signs a contract agrees to be bound by the terms of that contract. In its simplest terms, petitioners argue that they should not be held to an agreement that they signed but did not take the time to read. There must exist something more before we can find the arbitration clause at issue to be unconscionable. *See Smith v. EquiFirst Corp.*, 117 F.Supp.2d 557, 565 (S.D.Miss.2000) (stating that "a failure by plaintiffs to so inform themselves of what they were signing does not make the [arbitration] agreement unconscionable or unenforceable") (alteration added).

Petitioners next argue that the arbitration agreement should be set aside because the arbitration clause "was provided on a take-it-or-leave-it basis, with no opportunity for negotiation." In effect, petitioners contend that the Disclosure Agreement amounts to a contract of adhesion. A contract of adhesion has been defined as one "that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. b (1971); *see also* BLACK'S LAW DICTIONARY 342 (8th ed. 2004) (defining "adhesion contract" as "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who adheres to the contract with little choice about the terms") (alteration added).

A contract of adhesion is not automatically deemed *per se* unconscionable. As Judge Wilner, then Chief Judge of the Court of Special Appeals, correctly stated in *Meyer v. State Farm Fire & Cas. Co.*, 85 Md.App. 83, 582 A.2d 275 (1990):

"The fact that a contract is one of adhesion does not mean that either it or any of its terms are invalid or unenforcea-

---

**5.** Petitioners' argument here validates what Voltaire said, that "common sense is not so common." VOLTAIRE, DICTIONNAIRE PHILOSOPHIQUE (1764).

ble. A court will, to be sure, look at the contract and its terms with some special care. As in most cases, it will refuse to enforce terms that it finds unconscionable and will construe ambiguities against the draftsman; but it will not simply excise or ignore terms merely because, in the given case, they may operate to the perceived detriment of the weaker party."

*Id.* at 89–90, 582 A.2d at 278. Therefore, even assuming *arguendo* that the Disclosure Agreement signed by petitioners is in fact a contract of adhesion,[6] that is not the end of the inquiry—we must examine the *substance* of the particular provision at issue, the arbitration clause, to decide whether it is unconscionable. To that end, we must consider whether the terms in the arbitration clause are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause.

### 2. Substantive Unconscionability

#### a. Lack of Mutuality

Petitioners contend that the arbitration clause is substantively unconscionable for numerous reasons, the first being that it "requires that all disputes that the borrower may have must be arbitrated, but carves out the remedies that a lender or lender's assignee might pursue against a defaulting borrower from the operation of the provision. . . . There is no mutuality in the arbitration clause because there are no important remedies that a lender/assignee could pursue against the borrower that have not been excluded from arbitration." Petitioners claim that the language in the arbitration clause evidences the following:

---

**6.** We note, however, that petitioners have not alleged that the principal benefit they sought from Empire in February of 1998—a secondary mortgage loan—was not reasonably available to them from other sources. Moreover, Petitioners did not allege that they needed to negotiate and were rebuffed by respondent/assignor.

"Nothing in this agreement shall be construed to limit the right of any party to 1) foreclose against real or personal property or other security by an exercised power of sale under a security instrument or applicable law, 2) exercise self-help remedies, or 3) obtain provisional or ancillary remedies with regard to such securities, including without limitation, injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a Court having competent jurisdiction before, during or after the pendency of any arbitration." [Emphasis omitted.]

Petitioners overreach in their assessment of their lack of judicial remedies pertaining to possible disputes under the arbitration clause, which they claim amounts to an impermissible lack of mutuality in the arbitration agreement. In *Cheek v. United Healthcare, supra,* we recognized that "[t]he determination of whether there is an agreement to arbitrate ... depends on contract principles since arbitration is a matter of contract," and that "[t]o be binding and enforceable, contracts ordinarily require consideration." *Cheek,* 378 Md. at 147, 835 A.2d at 661 (citing *Harford County v. Town of Bel Air,* 348 Md. 363, 381–82, 704 A.2d 421, 430 (1998)).

*Cheek* involved whether a valid and enforceable arbitration agreement between an employer and an employee existed where the employer declared in a summary of its arbitration policy that it reserved "the right to alter, amend, modify, or revoke the [arbitration agreement] at its sole and absolute discretion at any time with or without notice." *Cheek,* 378 Md. at 142–43, 835 A.2d at 658 (alteration added). We held that the arbitration agreement in that instance was not valid and enforceable because the employer's promise to arbitrate disputes was illusory under the language of the arbitration agreement. *Id.* at 144, 835 A.2d at 659. Of particular importance to the case *sub judice* is the following discussion in *Cheek:*

"[M]utual promises to arbitrate act as 'an independently enforceable contract.' In an enforceable arbitration agreement ... each party has promised to arbitrate disputes

arising from an underlying contract, and 'each promise provides consideration for the other.' Thus, in a motion to compel arbitration, a court must determine whether 'there is a mutual exchange of promises to arbitrate,' and '[o]nce a court determines that the making of the agreement to arbitrate is not in dispute, its inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract.' "

*Id.* at 153–54, 835 A.2d at 665 (citations omitted).

 Petitioners argue that there is an oppressive lack of mutuality in the arbitration agreement because "the clause provides the lender with an option—foreclosure or arbitration—that is not provided to the borrower." Mutuality, however, does not require an exactly even exchange of identical rights and obligations between the two contracting parties before a contract will be deemed valid. *See Harford County v. Town of Bel Air,* 348 Md. 363, 383, 704 A.2d 421, 431 (1998) (stating that " '[i]t is well settled that the Courts of Law . . . will not inquire into the adequacy of the value exacted for the promise so long as it has some value' ") (quoting *Blumenthal v. Heron,* 261 Md. 234, 242, 274 A.2d 636, 640 (1971)). Therefore, there need not exist an identical mutuality of remedy between petitioners and Sovereign Bank before the arbitration agreement will be deemed valid.

We do not find that the exceptions to the arbitration agreement, which allow Sovereign Bank to litigate certain specific claims instead of having to submit them to arbitration, are so unfairly oppressive as to make the agreement unconscionable. Unlike *Cheek,* the arbitration clause at issue here is not illusory—Sovereign Bank is bound to arbitrate certain disputes, just as are petitioners, instead of pursuing them in a judicial forum. The mere fact that the arbitration agreement does except from its purview, however, a foreclosure proceeding, does not destroy mutuality and make the arbitration agreement so one-sided as to make it unconscionable. An arbitrator cannot order foreclosure so the foreclosure action, of necessity, is preserved. *See Harris v. Green Tree Finan-*

*cial Corp.,* 183 F.3d 173, 179–81 (3d. Cir.1999) (Third Circuit rejecting borrower's argument that an arbitration provision in a secondary mortgage contract was unconscionable because the lender retained the right to sue in court to enforce its security agreement).

In *Conseco Finance Servicing Corp. v. Wilder,* 47 S.W.3d 335 (Ky.Ct.App.2001), the Court of Appeals of Kentucky had before it a case where the assignee of a sales contract and security agreement for mobile homes brought suit under the contract to repossess the mobile home of purchasers who had ceased to make payments on their mobile home. The mobile home owners filed suit to have the contract rescinded for breach of warranties and other various violations. The assignee responded to the suit by moving to compel arbitration pursuant to an arbitration clause in the contract.

Arguing before the Kentucky appellate court, the mobile home owners urged, *inter alia,* that the arbitration clause was unconscionable because the lender had reserved under the arbitration agreement the right to seek judicial redress of its likeliest claims—foreclosure proceedings—while reserving the right to arbitrate any claim by the purchasers who defaulted on their payments.[7] In rejecting this argument, the court initially noted that "there is no inherent reason to require that the parties have equal arbitration rights." *Id.* at 343. The court then stated:

> "The exceptions ... are not unreasonable. Arbitration is meant to provide for expedited resolution of disputes, but the claims the agreement permits Conseco to litigate—basically claims asserting its security interest—may be liti-

---

7. The pertinent portion of the arbitration clause at issue in *Conseco* stated:

 "Notwithstanding anything hereunto the contrary, you retain an option to use judicial (filing a lawsuit) or non-judicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home."

 *Conseco,* 47 S.W.3d at 339.

gated expeditiously. Such claims have come to be heavily regulated by statute, allowing for streamlined procedures and effective protections for both sides. It does not strike us as unreasonable, much less oppressive, to forego arbitration of such claims."

*Id.* (footnote omitted). *See also Torrance v. Aames Funding Corp.*, 242 F.Supp.2d 862, 872 (D.Or.2002) (holding that agreement to arbitrate "not rendered unconscionable simply because [mortgage lender] is not required to arbitrate all claims") (alteration added).

The valid justification for a mortgage lender to retain the right to pursue certain remedies in a judicial forum as exceptions to an agreement to arbitrate was also made clear by the Court of Appeals of South Carolina in *Lackey v. Green Tree Financial Corp.*, 330 S.C. 388, 498 S.E.2d 898 (S.C.Ct.App. 1998), where that court explained that such exemptions are understandably warranted based on business realities:

"Secured transactions allow lenders to take greater risks because their ability to protect a loan is enhanced by the legal right to recover and sell the collateral in the event of default. Judicial remedies for the recovery of property, such as ... the foreclosure action, provide specific procedures for protection of collateral and the parties during the pendency of the proceedings. These protections relate to both parties, and are facilitated by the enforcement procedures specified in the law. Thus, we conclude this [arbitration] clause does bear a reasonable relationship to the business risks."

*Id.* at 401, 498 S.E.2d at 905 (alteration added).

Maryland foreclosure proceedings, like those of both Kentucky and South Carolina, do not act solely to protect the interests of the mortgage lender against a defaulting debtor but instead provide protections for both sides. *See Simard v. White*, 383 Md. 257, 318, 859 A.2d 168, 204 (2004) (stating that "our Court [has] recognized that while the mortgage is intended to secure the debt, both the interests of debtor and of creditor command certain protections, even in the event of

default") (alteration added). We agree with these other juris-dictions and their findings that the act of a mortgage lender in providing certain exceptions for itself in the arbitration agreement, such as the ability to pursue foreclosure proceedings in a judicial forum, does not in and of itself make the arbitration agreement unconscionable where the mortgage-debtor/bor-rower is not provided with identical exceptions to the arbitration agreement. The arbitration agreement at issue, which includes exceptions to that agreement that enable the mortgage lender, presently Sovereign Bank, to pursue certain judicial remedies including foreclosure, is not made unconscionable where petitioners are not provided with identical exceptions to the arbitration agreement.

### b. Prohibition on Class–Action Proceedings

Petitioners argue that the arbitration clause, which explicit-ly makes unavailable to them a class-action procedure, makes the arbitration agreement unconscionable. The arbitration clause expressly provides that "any dispute subject to arbitra-tion shall not be adjudicated as a class action or consolidated class proceeding" (emphasis omitted).

 Numerous courts, both federal and state, have rig-orously enforced no-class-action provisions in arbitration agreements and found them to be valid provisions of such agreements and not unconscionable. *See, e.g., Snowden v. CheckPoint Check Cashing,* 290 F.3d 631, 638 (4th Cir.2002), *cert. denied,* 537 U.S. 1087, 123 S.Ct. 695, 154 L.Ed.2d 631 (2002) (stating "[w]e [ ] reject Snowden's argument that the Arbitration Agreement is unenforceable as unconscionable because without the class action vehicle, she will be unable to maintain her legal representation given the small amount of her individual damages"); *Med Center Cars, Inc. v. Smith,* 727 So.2d 9, 20 (Ala.1998) (stating that "to require class-wide arbitration would alter the agreements of the par-ties, whose arbitration agreements do not provide for class-wide arbitration"); *Rains v. Foundation Health Systems Life & Health,* 23 P.3d 1249, 1253 (Colo.App.2001) (stating that "arbitration clauses are not unenforceable simply be-

cause they might render a class action unavailable"); *Edelist v. MBNA America Bank,* 790 A.2d 1249, 1261 (Del.Super.Ct.2001) (finding that, because "[t]he surrender of [the] class action right was clearly articulated in the arbitration amendment[,] [t]he Court finds nothing unconscionable about it and finds the bar on class actions enforceable") (alterations added); *Rosen v. SCIL, LLC,* 343 Ill.App.3d 1075, 278 Ill.Dec. 770, 799 N.E.2d 488, 494 (2003) (finding arbitration clause "enforceable despite its prohibition on class actions"); *Ranieri v. Bell Atlantic Mobile,* 304 A.D.2d 353, 759 N.Y.S.2d 448 (2003) (stating that "given the strong public policy favoring arbitration ... and the absence of a commensurate policy favoring class actions, we are in accord with authorities holding that a contractual proscription against class actions ... is neither unconscionable nor violative of public policy") (citations omitted); *AutoNation USA Corp. v. Leroy,* 105 S.W.3d 190, 200 (Tex.App.2003) (enforcing arbitration clause which prohibited class-action claims, stating that "there is no entitlement to proceed as a class action").

Moreover, in our decision in *Gilman v. Wheat, First Securities, Inc.,* 345 Md. 361, 692 A.2d 454 (1997), we held that a forum-selection clause, which was part of an arbitration agreement, requiring the parties to litigate their disputes in Virginia, which did not provide a class-action procedure, was "not unreasonable and should be enforced." *Id.* at 382, 692 A.2d at 465. In reaching this conclusion, we stated that:

"We are unaware of any case—and none has been cited to us—in which the unavailability of a class action procedure, either generically or in a particular case, has been regarded as sufficient to render an otherwise valid forum-selection clause unenforceable.

. . .

"*It is important to recall once again that the clause in question was part of an arbitration agreement, under which Gilman agreed to arbitrate any disputes he had with Wheat arising from the account,* that, under that clause, he expressly waived his right 'to seek remedies in court, including

the right of jury trial,' and that he had a choice of fora in which to conduct the arbitration."

*Id.* at 381–82, 692 A.2d at 464 (emphasis added). Following our holding in *Gilman,* we would be averse to a holding in the present case which would allow petitioners to avail themselves of a class action contrary to the provisions of a freely-signed agreement to arbitrate that includes a no-class-action provision which was conspicuously presented as part of the arbitration clause. Petitioners do point out cases in which courts have adhered to an unquestionably minority view that finds that a no-class-action provision in an arbitration agreement can make the agreement unconscionable and unenforceable. *See Ting v. AT&T,* 319 F.3d 1126, 1150 (9th Cir.2003) (affirming federal district court's conclusion that "the class action ban [in an arbitration agreement] violates California's unconscionability law") (alteration added); *Acorn v. Household International, Inc.,* 211 F.Supp.2d 1160 (N.D.Cal.2002) (finding provision of arbitration agreement that prohibited class actions substantively unconscionable); *Szetela v. Discover Bank,* 97 Cal.App.4th 1094, 118 Cal.Rptr.2d 862 (2002) (same). Insofar as these cases are for the proposition that a no-class-action provision in an arbitration agreement is so one-sided as to make that agreement unconscionable, we are unpersuaded. We cannot ignore the strong policy, made clear in both federal and Maryland law, that favors the enforcement of arbitration provisions. We believe that the opinions to which petitioners cite that hold otherwise give short shrift to this principle. *See Metro East Center for Conditioning and Health v. Qwest Communications International, Inc.,* 294 F.3d 924, 927 (7th Cir.2002) (arguments based on the costs of arbitration and the preclusion of class actions are "the sort of litany the Federal Arbitration Act is supposed to silence"). Therefore, we do not find the no-class-action provision to be so one-sided or oppressive to petitioners as to render the arbitration agreement at issue unconscionable.

### c. *Disclosure of Arbitration Fees*

Petitioners next contend that the lender's failure to disclose the fees associated with an arbitration "effectively concealed

the significance" of the arbitration clause and should render the arbitration agreement unconscionable. Sovereign Bank responds that the arbitration agreement cannot be invalidated on the basis of speculative costs and that arbitration, in contrast to the often substantial costs of litigation, may be a more cost-effective means for the petitioners to pursue their claims.

 Petitioners have submitted several cases from other jurisdictions in support of their contention that the potential accumulation of an unknown sum in arbitration fees serves to discourage them from pursuing their claim. The cases cited by petitioners, however, as noted by the Court of Special Appeals, involve arbitration fees severely in excess of the mandatory fees in the instant case. Sovereign Bank relies primarily on the factually-similar case of *Green Tree Financial Corp.–Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), in which the United States Supreme Court directly addressed the question of fees potentially incurred in respect to arbitration proceedings. In *Green Tree Financial*, a mobile home buyer brought a class-action suit against the lender for alleged Truth in Lending Act ("TILA") and Equal Credit Opportunity Act ("ECOA") violations in the loan agreement, which required that all disputes arising from or related to the contract were to be resolved by binding arbitration. *Id.* at 82, 121 S.Ct. at 518. The Supreme Court affirmed the determination of the United States Court of Appeals for the Eleventh Circuit that the lower court's order compelling arbitration and dismissing the underlying litigation issues was a final, appealable order, but reversed the Eleventh Circuit's holding that the arbitration agreement's silence as to the filing fees, arbitrators' costs, and other arbitration expenses had rendered the arbitration provision unenforceable because it exposed the buyer to potentially steep arbitration costs. *Id.* at 84, 121 S.Ct. at 518–19. Acknowledging that the *Green Tree Financial* parties had provided no detail of the expected arbitration fees and costs, the Supreme Court observed that while "the existence of large arbitration costs could preclude a litigant" of limited resources from effectively

pursing her claims in an arbitral forum, "[t]he 'risk' that [the buyer] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 90–91, 121 S.Ct. at 522 (alteration added). Effectively, *Green Tree Financial* placed upon the party asserting the prohibitive expense "the burden of showing the likelihood of incurring such costs." *Id.* at 92, 121 S.Ct. at 522. In addition, we note that although the arbitration clause in the present case specifically articulates neither the costs and fees of the arbitration, nor who is to pay these fees and costs, nor how they might be allocated, it delineates that the arbitration is to be conducted under "the Code of Procedure of the National Arbitration Forum," whose fee schedule was noted as a model for fair cost and fee allocation in *Green Tree Financial. See Id.* 531 U.S. at 95 n. 2, 121 S.Ct. at 524 n. 2 (Ginsburg, J., concurring in part and dissenting in part).

In a case decided shortly after *Green Tree Financial,* the United States Court of Appeals for the Fourth Circuit observed it would be inappropriate to apply a broad *per se* rule to the efficacy of an arbitral forum:

"The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are 'too high.' Rather, an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs. Another factor to consider in the cost-differential analysis is whether the arbitration agreement provides for fee-shifting, including the ability to shift forum fees based upon the inability to pay. We note that parties to litigation in court often face costs that are not typically found in arbitration, such as the cost of longer proceedings and more complicated appeals on the merits."

*Bradford v. Rockwell Semiconductor Systems, Inc.,* 238 F.3d 549, 556 n. 5 (4th Cir.2001) (rejecting argument that arbitration clause containing a fee-splitting provision which required employee to share the arbitration costs and pay half the

arbitrator's fee rendered the arbitration agreement *per se* unenforceable).

In the case *sub judice* petitioners tally their anticipated costs of arbitration, based on the fee schedule of the National Arbitration Forum [8] at approximately $720.00. This figure is, indeed, approximate, because it includes both the mandatory filing fee to be paid by the consumer claimant (*i.e.*, petitioners) as well as fees that are likely to be paid by Sovereign Bank or that will be divided between both the petitioners and Sover-

---

**8.** The National Arbitration Forum's ("NAF") fee schedule can be found at http://www.arb-forum.com/programs/code/appx-c.asp. For a disputed dollar amount between $15,001 and $30,000, (the Court of Special Appeals listed petitioners' claim amount as $25,559.74), the schedule indicates a filing fee of $60, a commencement fee of $60, an administrative fee of $650, and a participatory hearing session fee of $500. NAF's explanation accompanying the fee schedule indicates that "[a] Consumer Claimant pays the Filing Fee and $250 (two-hundred fifty dollars) of the fee for a Participatory Hearing selected by the Consumer, unless otherwise provided by agreement of the Parties or required by applicable law. *A Business Respondent pays the Commencement and Administrative Fees and the fee for a Participatory Hearing, if selected by the Business Respondent, or the fee for a Participatory Hearing less $250 (two-hundred fifty dollars), if selected by the Consumer. ...*" *Id.* (emphasis added). In addition, there is a $50 hearing procedural fee for each scheduled hearing session.

Other costs indicated on NAF's website include "common claim request fees" such as a processing fee of $10, a request for amendment fee of $100, request for a subpoena fee of $50, a request for a discovery order fee of $50, etc. The fee for a written findings of fact, conclusions of law or reasons for the award in a common claim case varies with the dollar amount of the claim. Based on the aforementioned claim amount, the fee in the instant case would be $400, should the parties require a statement of findings and conclusions. NAF's explanation of common claim request fees provides:

"A Business Party pays the entire fee where an Arbitration Agreement with a Consumer Party requires written findings of fact, conclusions of law or reasons for an Award. A Consumer Party pays $100 (one-hundred dollars) and a Business party pays the remaining portion where an Arbitration Agreement does not provide for written findings, conclusions, or reasons and a Consumer Party requests such an Award. All other Parties who make this Request pay the entire fee, unless otherwise provided by agreement of the Parties or required by the applicable law."

The present arbitration agreement does not provide for a written statement of findings, conclusions or reasons. Clearly, the arbitration

eign Bank. The Court of Special Appeals noted that the arbitration would likely be more expedient and less procedurally cumbersome for petitioners than would a circuit court trial. Because the fees arising from the arbitration cannot be predicted in detail and petitioners have not shown them to be unduly burdensome, we cannot find the arbitration agreement's absence of a cost schedule or cost allocation to be unconscionable.

### d. Jury Trial Waiver Provision

■ Petitioners next argue that the arbitration clause is substantively unconscionable because "[t]he invocation of the arbitration clause in this case involves the waiver of a fundamental right—the right to trial by jury." The arbitration clause, which petitioners signed, states that "[t]he parties acknowledge that they are waiving their right to jury trial by consenting to binding arbitration" (emphasis omitted). Petitioners posit that they "did not waive their fundamental right to a jury trial in a knowing and voluntary manner. Rather, they were rushed into signing documents that they were given no opportunity to review in advance without any explanation concerning the rights they were waiving." As we shall explain, petitioners contention on this point is unpersuasive.

■ Article 23 of the Maryland Declaration of Rights,[9] guarantees the right to a jury trial in civil cases. Although the right to a jury trial is fundamental, parties can contractually waive their right to a jury trial. In order to have a valid waiver of a fundamental right such as the right to a jury trial, however, there ordinarily must exist a "knowing and intelligent" waiver of the right. *See, e.g., Richardson v. State,* 381

---

costs and fees vary according to a party's specific arbitration amount at issue, procedure and requirements.

9. Article 23 of the Maryland Declaration of Rights provides, in pertinent part, that "[t]he right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State ... shall be inviolably preserved." Md.Code (1958, 2003 Repl. Vol.), Article 23 of the Constitutions Article.

Md. 348, 366, 849 A.2d 487, 498 (2004) (waiver of Sixth Amendment fundamental right to counsel in criminal proceedings valid if "knowing and intelligent"); *Maryland–National Capital Park and Planning Comm'n v. Washington National Arena*, 282 Md. 588, 613–14, 386 A.2d 1216, 1233 (1978) (stating that "constitutional rights, including the right to procedural due process, may be relinquished by agreement, provided any such waiver is 'voluntary, knowing, and intelligently made.'") (quoting *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972)).

Petitioners' bald assertion that they should not be held to have waived their right to a jury trial after they signed the Disclosure Agreement because they did not know that the arbitration clause contained such a waiver is fundamentally lacking in persuasive effect. Because the right to a jury trial "attaches in the context of judicial proceedings after it is determined that litigation should proceed before a court ... the 'loss of the right to a jury trial *is a necessary and fairly obvious consequence* of an agreement to arbitrate.'" *Sydnor v. Conseco Financial Servicing Corp.*, 252 F.3d 302, 307 (4th Cir.2001) (emphasis added) (quoting *Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir.1984)). Therefore, the loss of one's right to a jury trial is *generally implicit* in an agreement to arbitrate.[10] That, and more, was made succinctly clear by the intermediate appellate court in *Meyer v. State Farm Fire & Cas. Co.*:

> "An agreement to arbitrate either future or existing disputes involves more than just the waiver of a right to jury trial, although that is certainly implicit in such an agreement. It constitutes an election to use an alternative dispute resolution mechanism that the law not only recognizes but encourages. If appellants' position were correct, the whole foundation of the Federal and uniform arbitration acts could be placed in jeopardy. Arbitration clauses are

---

**10.** In the case *sub judice*, the waiver of a jury trial was also made explicit by the very language of the arbitration clause, which, as stated *supra*, was conspicuously presented in the Disclosure Agreement.

standard not only in insurance contracts but in construction contracts, employment agreements, and a variety of other contracts that may, in some instances, be regarded as being of adhesion. If the 'weaker' party to such contracts were able to escape the duty to arbitrate on the premise that he was unaware of the arbitration clause and therefore had not validly waived his Federal or State Constitutional right to a jury trial, the viability of this favored method of dispute resolution would be significantly circumscribed."

*Meyer*, 85 Md.App. at 91, 582 A.2d at 278–79.

On the evening of February 17, 1998, petitioners signed the two-page Disclosure Agreement, which perhaps would have taken ten minutes at most to read.[11] If petitioners did not do so before they signed the agreement, they have no persons to blame but themselves. As expressed earlier in our discussion, we are loath to rescind a conspicuous arbitration agreement that was signed by a party whom now, for whatever reason, does not desire to fulfill that agreement.

Other jurisdictions presented with this particular issue have held a waiver of jury trial provision embedded within an arbitration clause can generally only be found to be unenforceable if the waiver provision itself is dubiously inconspicuous in the entire agreement as a whole. *See Gaylord Dep't Stores of Alabama, Inc. v. Stephens,* 404 So.2d 586, 588 (Ala.1981) (jury trial waiver provision "buried in paragraph thirty-four in a contract containing forty-six paragraphs"); *Fairfield Leasing Corp. v. Techni–Graphics, Inc.,* 256 N.J.Super. 538, 607 A.2d 703 (Law Div.1992) (holding jury trial waiver unconscionable and unenforceable where the clause was buried in extremely fine print in an adhesion contract, one-half the ordinary size of print, in the midst of many other clauses); *see also* Jean R. Sternlight, *Mandatory Binding Arbitration and the Demise of the Seventh Amendment Right to a Jury Trial,* 16 OHIO ST. J. ON DISP. RESOL. 669, 684–85 (2001) (stating that "[t]he

---

11. We note that petitioners also signed their respective initials ("DGW" and "TLW") to the bottom of the first page of the two-page Disclosure Agreement.

conspicuousness of the [jury trial waiver] clause depends upon such things as font size, typeface, and placement. Courts are more likely to uphold waivers that are displayed in large typeface, *bold*,[12] or capital lettering. They are also more likely to uphold waivers that are placed in a key location, *such as near the signature line of an agreement*") (alteration added) (emphasis added) (footnote added) (footnotes omitted).

Because the jury trial waiver was not presented in the Disclosure Agreement in an inconspicuous manner, as it appeared as part of the underlined and distinct arbitration clause, which was located immediately above petitioners' signatures, and a jury trial waiver is generally implicit in an agreement to arbitrate, we hold that the jury trial waiver did not unfairly usurp the fundamental right to a jury trial from petitioners. An arbitration clause *by its most basic nature* waives a party's right to have disputes resolved in litigation and creates the right to have them resolved by arbitration.

### B. Did Sovereign Bank's Actions Constitute a Waiver of the Arbitration Agreement?

Petitioners contend that Sovereign Bank's March 10, 2003, filing of a "Petition to Compel Arbitration and Motion to Dismiss or to Stay Proceedings," in response to petitioners' complaint, constituted a waiver of Sovereign Bank's right to arbitration. Specifically, petitioners read two paragraphs contained within Sovereign Bank's five-paragraph motion as seeking a substantive determination on the merits. The "Petition to Compel Arbitration and Motion to Dismiss or to Stay Proceedings" states, in relevant part:

"3. Any claim the plaintiffs may have had under the SMLL accrued more than three years ago and is barred by the statute of limitations.

4. Plaintiffs' claims are also barred by their failure to provide defendant with notice and an opportunity to redress

---

**12.** The act of having a specific clause in an agreement underlined is no different that having it be in a **bold** typeface as it relates to the clause being made conspicuous from other, non-distinct clauses.

the alleged overcharges prior to initiating any legal proceedings, as required by the loan agreement."

Petitioners assert that, in light of the parties' mutual consent to binding arbitration as expressed in the "Direct Loan Note & Truth in Lending Disclosures," a party may not pursue dual legal and arbitration remedies. In support of its position, petitioners point to *RTKL Assoc., Inc. v. Four Villages Ltd. Partnership,* 95 Md.App. 135, 620 A.2d 351 (1993), in which the Court of Special Appeals affirmed the circuit court's finding of a waiver of a right to arbitration where the party seeking to compel arbitration had waited five years after filing its claim demanding arbitration and in that five-year period had actively participated in litigation including depositions, other discovery, and filing of a motion for summary judgment. *See id.* at 144–45, 620 A.2d at 355–56.

Sovereign Bank responds that its "Petition to Compel Arbitration and Motion to Dismiss or to Stay Proceedings" was its first and only circuit court pleading, a pleading aimed at getting the matter to arbitration. It observes that petitioners' contention looks solely at isolated excerpts of its petition while neglecting the language of the memorandum in support of the petition that seeks to dismiss petitioners' complaint on grounds of untimeliness or lack of notice *only if* the primary argument—that petitioners unequivocally have consented to arbitrate their dispute—were to fail.

The record does not indicate that there occurred any argument on Sovereign Bank's petition and the circuit court signed an order in favor of Sovereign Bank on April 2, 2003, to compel arbitration as indicated in the loan agreement and to stay or dismiss the proceedings, but declined to dismiss the case. It appears that no adjudication on the merits of the case took place.

Sovereign Bank goes on to assert that its mere filing of a singular, responsive, pleading only minimally invoked the judicial process and cannot amount to election of an alternative forum for adjudication of the instant dispute. Sovereign Bank argues that, unlike the facts in *RTKL Assoc.* that led to a

waiver finding, it has occasioned no delay in its request for arbitration, there was no argument on the merits of the case and no discovery has occurred between the parties.

In *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 468 A.2d 91 (1983), this Court undertook a survey of other juris- dictions' positions in respect to whether a party's failure to initiate the arbitration amounted to a waiver of the right to arbitrate, and found that most courts "have decided that in the absence of express language in a contract placing the initial obligation of seeking arbitration on either of the contracting parties, it is the responsibility of the party asserting a claim to initiate arbitration." *Id.* at 109, 468 A.2d at 98. We explained that "[t]he rationale underlying these cases is that a party asserting a claim who sues instead of seeking arbitration is in essence refusing to arbitrate and is itself in default of the arbitration agreement." *Id.* at 110, 468 A.2d at 98–99.

We note that while "a party against whom a claim is asserted, and who is not therefore seeking relief, does not have an obligation to initiate arbitration," *Id.* at 113, 468 A.2d at 100, Sovereign Bank was not prohibited from initiating the arbitration, because "[a] party asserting a claim who sues instead of seeking arbitration is in essence refusing to arbi- trate and is itself in default of the arbitration agreement." *Id.* at 113–14, 468 A.2d at 100. In the case *sub judice*, it was petitioners who filed a complaint to launch the litigation process, yet as the party asserting a claim, it was, therefore, petitioners' duty to initiate the arbitration process, a process to which they had, by the very terms of the loan document, explicitly agreed. A review of their complaint reveals no mention of the arbitration clause contained in the Disclosure Agreement. Either petitioners overlooked the arbitration provision's manifest and highlighted existence or they some- how found its manifest and highlighted existence inapplicable to "any claim, dispute or controversy" such as theirs. No matter the motivation, it is petitioners who seem intent to avoid arbitration. That Sovereign Bank responded to the complaint in the same forum with a filing that contained a

demand for arbitration was not a full-course plunge into the courts, but rather an effort to petition the court to compel the parties to adhere to the terms of their agreement to arbitrate "any claim, dispute, or controversy." *See The Redemptorists v. Coulthard Servs., Inc.,* 145 Md.App. 116, 143, 801 A.2d 1104, 1120 (2002) (finding, *inter alia,* that the filing of a motion to dismiss on a jurisdictional ground was not a manifest showing of a party's intent to waive its right to arbitrate the claims against it). Moreover, once petitioners had filed a complaint, Sovereign Bank, presuming its desire to arbitrate the dispute as provided by the Disclosure Agreement, had no recourse but to petition the circuit court, in order to compel petitioners to engage in arbitration. In the absence of an order from the court, Sovereign Bank could not very well successfully invite an unwilling adversary to an arbitration which it had already failed to initiate and at which it, most likely, would refuse to appear.

In *Charles J. Frank, Inc. v. Associated Jewish Charities of Baltimore, Inc.,* 294 Md. 443, 450 A.2d 1304 (1982), this Court reversed the circuit court's determination in a construction dispute that a contractor's third-party claim on arbitrable issues, which contained no demand for arbitration, filed against the building's owner, to which the owner filed a demurrer and an answer, constituted the contractor's waiver of arbitration for all issues, *i.e.,* those issues that were litigated as well as unrelated issues arising under the contract. *Id.* at 450, 450 A.2d at 1307. In *Frank,* we provided three bases for our determination:

"The first rationale is that the public policy in favor of arbitration would be frustrated if agreements to arbitrate were not enforced.

. . .

"The second rationale is that the enactment of the Uniform Arbitration Act evidences a legislative intent that arbitration not be enjoined to prevent multiplicity of actions.

. . .

"The third rationale is that it is unfair to deprive a party to an arbitration agreement of its right to arbitrate when the burden of the potential for duplicative proceedings and inconsistent results was created by the voluntary actions of the party that would bear that burden."

*Id.* at 457–58, 450 A.2d at 1311.

In the instant case, the circuit court's April 2, 2003, order included no final judgment on any issue that might be subject to arbitration. Thus, Sovereign Bank attained no determination on any of the issues in dispute. Sovereign Bank's actions do not constitute a repudiation of the Disclosure Agreement's arbitration provision but, in light of the fact that petitioners seemed intent to avoid arbitration, rather amount to a continued *affirmative* step in further pursuit of an adjudication by arbitration of the parties' dispute. Accordingly, the results of Sovereign Bank's petition was neither a waiver of the right to arbitration nor of any of the issues that might be subject to arbitration.

## IV. Conclusion

We hold that the arbitration agreement entered into by petitioners and Sovereign Bank is a valid and enforceable agreement and was neither procedurally nor substantively unconscionable so as to make the agreement unenforceable. Because the arbitration clause was conspicuously distinct from other provisions in the Disclosure Agreement and the clause immediately preceded petitioners' signatures, petitioners' claim that they should not be held to their agreement because they did not read it before signing it is unavailing. Moreover, the numerous substantive reasons that petitioners argue should make the agreement be regarded as unfairly one-sided and unconscionable do not have such effect.[13] Therefore, the

---

13. We need not decide in this case whether, in a situation where (1) one party to an agreement containing a valid arbitration clause reserves the right to seek a judicial remedy that only a court can provide, such as foreclosure or a mechanic's lien, (2) the party opts for that remedy, (3) a contract defense is asserted by the other party to liability, and (4) that party demands arbitration of the dispute, the court, on motion and

circuit court was correct to order petitioners to arbitrate their dispute.

We hold that Sovereign Bank's filing of a "Petition to Compel Arbitration and Motion to Dismiss or to Stay Proceedings" did not constitute a waiver of the arbitration agreement contained in the Disclosure Agreement. Sovereign Bank timely filed its petition as a response to petitioners' complaint and the circuit court's subsequent order resulted in no final adjudication of arbitrable issue. Thus, despite the petitioners' attempted bypass of the arbitration agreement, Sovereign Bank preserved its selection of arbitration as the forum for determination of "any claim, dispute or controversy arising from or relating to" the Disclosure Agreement.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**

BELL, C.J., dissents and files opinion in which GREENE, J., joins.

BELL, Chief Judge, dissenting in which GREENE, J., joins.

In this case, the majority holds that the arbitration clause [1] contained in the "Direct Loan Note & Truth in Lending

---

pursuant to Maryland Code, §§ 3–207 and 3–209 of the Courts and Judicial Proceedings Article or the counterpart provisions in the Federal Arbitration Act, would be required to stay the judicial proceeding and direct that dispute to be resolved in arbitration. That issue is not presently before us.

1. It provided:
 *"**BINDING ARBITRATION.** The parties agree that any claim, dispute or controversy arising from or relating to this agreement or the relationships which result from this agreement, including the validity of this arbitration clause, or the entire agreement, shall be resolved by binding arbitration by and under the Code of Procedure of the National Arbitration Forum in effect at the time this claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1–16. Judgment upon the award may be entered in any court having jurisdiction. Nothing in this agreement shall be construed to limit the right of any party to 1) foreclose against real or personal*

Disclosure," executed by David G. Walther and his wife, the petitioners, in favor of Sovereign Bank, the respondent, as a requirement for obtaining the secondary mortgage loan they sought from the respondent, is not unconscionable and, thus, is fully enforceable. Although the arbitration clause provided that "any claim, dispute or controversy arising from or relating to this agreement or the relationships which result from this agreement, including the validity of this arbitration clause, or the entire agreement, shall be resolved by binding arbitration by and under the Code of Procedure of the National Arbitration Forum in effect at the time," and that, by signing it, the parties waived adjudication by class action, consolidated class proceedings or trial by jury, it purported to reserve to "any party" the right:

"to 1) foreclose against real or personal property or other security by an exercised power of sale under a security instrument or applicable law. 2) exercise self-help remedies, or 3) obtain provisional or ancillary remedies with regard to such securities, including without limitation, injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a Court having competent jurisdiction before, during or after the pendency of any arbitration."

Emphasizing the favorable status of agreements to arbitrate, 386 Md. at 423–25, 872 A.2d at 742–43, quoting *Cheek v.*

---

property or other security by an exercised power of sale under a security instrument or applicable law, 2) exercise self-help remedies, or 3) obtain provisional or ancillary remedies with regard to such securities, including without limitation, injunctive relief, sequestration, attachment, garnishment, or the appointment of a receiver from a Court having competent jurisdiction before, during or after the pendency of any arbitration. The pursuit of any such remedy shall not constitute a waiver of the right of any party to have all other claims or disputes resolved by arbitration. The parties agree that any dispute subject to arbitration shall not be adjudicated as a class action or consolidated class proceeding. By signing this agreement, the parties acknowledge that they had a right or opportunity to litigate disputes through a court, but that they preferred to resolve any disputes through arbitration. The parties acknowledge that they are waiving their right to jury trial by consenting to binding arbitration."

*United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 146, 835 A.2d 656, 660 (2003) and referencing the Maryland Uniform Arbitration Act, Maryland Code (1974, 2002 Repl. Vol.) §§ 3–201, *et seq.* of the Courts and Judicial Proceedings Article, the majority rejects each of the petitioners' unconscionability arguments. The petitioners' arguments, in that regard, are premised on the loan documents, including the disclosure containing the arbitration clause, being a contract of adhesion, thus, affording the petitioners no meaningful choice,[2]

---

**2.** The majority assumes, *arguendo,* that the contract between the petitioners and the respondent is a contract of adhesion, but noted that the petitioners had not alleged that "the principal benefit they sought from [the lender] . . .—a secondary mortgage loan—was not reasonably available to them from other sources."

I have not the slightest doubt that the loan contract is one of adhesion, *i.e.,* a contract, usually prepared in printed form, "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." Restatement (Second) of Conflict of Laws §§ 187, Comment b. *See Meyer v. State Farm Fire and Cas. Co.,* 85 Md.App. 83, 89, 582 A.2d 275, 278 (1990); *Armendariz v. Found. Health Psychcare Servs.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 689 (2000), quoting *Neal v. State Farm Ins. Companies,* 188 Cal.App.2d 690, 694, 10 Cal.Rptr. 781 (1961) (contract of adhesion is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it"); *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989, 995 (1999), quoting *Passage v. Prudential–Bache Securities, Inc.,* 223 Mont. 60, 727 P.2d 1298, 1301 (1986) ("contracts of adhesion 'arise when a standardized form of agreement, usually drafted by the party having the superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms' "); *Lackey v. Green Tree Financial Corp.,* 330 S.C. 388, 498 S.E.2d 898, 901 (1998). It has been held that contracts of adhesion are procedurally unconscionable. *Circuit City Stores, Inc. v. Adams,* 279 F.3d 889, 893 (9th Cir.2002) ("The [arbitration agreement] is procedurally unconscionable because it is a contract of adhesion."); *Flores v. Transamerica Home-First, Inc.,* 93 Cal.App.4th 846, 853, 113 Cal.Rptr.2d 376, 382 (2001) ("A finding of a contract of adhesion is essentially a finding of procedural unconscionability"); *Acorn v. Household Intern., Inc.* 211 F.Supp.2d 1160, 1168 (N.D.Cal.,2002). But, as the majority correctly points out, 386 Md. at 429–30, 872 A.2d at 746, this does not end the analysis, *State ex rel Dunlap v. Berger,* 211 W.Va. 549, 567 S.E.2d 265, 273 (2002); *American Food Management, Inc. v. Henson,* 105 Ill.App.3d 141, 61 Ill.Dec. 122, 434 N.E.2d 59, 62–63 (1982). Upon finding that a contract is adhesive, the court is required then to determine whether

and the arbitration clause being "unreasonably favorable to the lender" [3] and requiring "excessive fees to have their claims heard."

I disagree with the majority. Although there is merit in the petitioners' arguments with respect to, at least the class action and the jury trial waivers, the lack of mutuality of the contract is so glaring as to be, by itself, more than sufficient to require reversal of the judgment of the Court of Special Appeals. Accordingly, I dissent.

As a threshold matter, I want to make clear that the arbitration clause purports to be fully bilateral, that is, fully applicable to all parties. Thus, the arbitration requirement is addressed to "[t]he parties." The exception for foreclosure actions, and the like, applies to "any party." And the waiver of class action proceedings and jury trial references "the parties." That said, it is clear that the arbitration clause is not bilateral, at all. Only the lender has retained a security interest in property, real or personal, and, thus, as the majority acknowledges, at least implicitly, 386 Md. at 432–34, 872 A.2d at 747–48, only it will ever have need of the exceptions reserved for security holders. Similarly, only the debtor is likely to be interested in proceeding by way of class action

---

"other factors are present which, under established legal rules—legislative or judicial—operate to render it [unenforceable]." *See Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 689, quoting *Graham v. Scissor—Tail, Inc.*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165, 173 (1981). While there is authority for the alternative sources proviso the majority interjects, see e.g. *Med Center Cars, Inc. v. Smith*, 727 So.2d 9, 15 (Ala.1998), the better reasoned view is to the contrary. *Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 675; *Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 1100, 118 Cal.Rptr.2d 862, 867 (2002).

**3.** More particularly, the petitioners maintain that the contract is overly one-sided, providing no mutuality of remedy: they are required to arbitrate all disputes under the contract, while the lender reserved the right to seek a judicial remedy in several situations. The contract favors the lender also, they contend, because it denies them the right to proceed by way of a class action. Additionally, the petitioners complain of the jury trial waiver effected by the arbitration clause. Finally, they say that the failure of the lender to disclose the fees associated with the arbitration process "effectively concealed the significance" of the arbitration election and, thus, of the arbitration clause.

proceedings because he or she may have to resort to them due to the small amount of damages to which he or she may be entitled from the lender. *See Ting v. AT&T*, 319 F.3d 1126, 1150 (9th Cir.2003), in which the court explained:

> " 'Although styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact [defendant] Discover [Card], because credit card companies typically do not sue their customers in class-action lawsuits.' "

(Quoting *Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 1101, 118 Cal.Rptr.2d 862, 867 (2002)).

The majority opines, with respect to the petitioners' lack of mutuality argument, that the lender is given, by the arbitration clause, an option that they are not, that "[m]utuality ... does not require an exactly even exchange of identical rights and obligations between the two contracting parties before a contract will be deemed valid.' " 386 Md. at 432–33, 872 A.2d at 747–48. For that proposition, it cites *Harford County v. Town of Bel Air*, 348 Md. 363, 704 A.2d 421 (1998). In that case, in which the enforcement of an agreement to arbitrate was not at issue, the Court stated a well settled, not novel rule of contract law: " 'Courts of Law ... will not inquire into the adequacy of the value exacted for the promise so long as it has some value.' " *Id.* at 383, 704 A.2d at 431, quoting *Blumenthal v. Heron*, 261 Md. 234, 242, 274 A.2d 636, 640 (1971). The contract at issue in *Harford County v. Town of Bel Air* was not a contract of adhesion. Rather it was between the County and the City, both represented by counsel, and the matter the court was asked to resolve was whether the County could breach that contract, entered into in the performance of a governmental function if dictated by the public good. 348 Md. at 366, 704 A.2d at 423. It is obvious, therefore, that what was not at issue in *Harford County v. Town of Bel Air* was the remedy envisioned by the contract. Nor was a contract of adhesion involved in that case. That case is simply not apposite. We rejected the County's argument, stating:

> "While it may be that the County's full expectations under the agreement have not been met, 'no party has a right to

rescind or modify a contract merely because he finds, in light of changed conditions, that he has made a bad deal.' " *Id.* at 384, 704 A.2d at 431.

There is a distinction between "mutuality of obligation" and "mutuality of remedy," *Northcom, Ltd. v. James,* 694 So.2d 1329, 1334 (Ala.1997), and, more to the point, they may have different impacts on the enforceability of an arbitration agreement. In *Northcom, Ltd. v. James,* the contract for the sale of radio stations contained an arbitration agreement, which required the sellers to arbitrate disputes, and a covenant not to compete, which gave the purchasers a judicial remedy for damages or injunctive relief in the event of its breach by the sellers. *Id.* at 1331–32. The court stated the issues as being "whether the arbitration clause in the contract between the parties applies to their present dispute and whether the arbitration clause is unenforceable for lack of mutuality." *Id.* at 1330. As a preliminary matter, the court noted:

"The questions of mutuality of obligation and mutuality of remedy are analytically distinct, but in the case of arbitration contracts they come to the same result. Generally, if there is no mutuality of obligation, there is no consideration flowing in one direction and thus there is no contract. All the cases we have seen on mutuality of remedy pertain to the remedy of specific performance, and the rule most broadly stated is that if there is no mutuality of remedy, the contract cannot be specifically enforced. If a pre-dispute arbitration agreement cannot be specifically enforced, it effectively is no contract, so a lack of mutuality of remedy is tantamount to a lack of mutuality of obligation."

*Id.* at 1334.

As to the mutuality of obligation question, noting that consideration for the contract as a whole, flowed from each party to the other, the court declined to invalidate the arbitration clause on that basis: "[t]he arbitration clause is not a separate contract that must be independently supported by consideration; it is simply one provision in a larger contract." *Id.* at 1336.

Turning to mutuality of remedy, the court reviewed its earlier exposition of the doctrine "that a party to a contract may not obtain specific performance of the other party's obligation under the contract if the party seeking specific performance cannot be compelled to specifically perform," *id.*, quoting *General Securities Corp. v. Welton,* 223 Ala. 299, 135 So. 329, 334–35 (1931), and various authorities on contracts. It held:

> "in a case involving a contract of adhesion, if it is not shown that the party in an inferior bargaining position had a meaningful choice of agreeing to arbitration or not, and if the superior party has reserved to itself the choice of arbitration or litigation, a court may deny the superior party's motion to compel arbitration based on the doctrines of mutuality of remedy and unconscionability."

*Id.* at 1338. Significantly, the court explained that:

> "The element of unconscionability in the context of an arbitration clause is supplied by the fact that, by agreeing to arbitrate, a party waives his right to 'a remedy by due process of law,' Ala. Const.1901, § 13, and his 'right of trial by jury,' Ala. Const.1901, § 11, and U.S. Const. Amend. VII. To allow such a waiver in an adhesion contract without a showing that it was voluntarily made might well be unconscionable. Moreover, a court in this state that is asked to enforce an arbitration clause is asked to rule contrary to the prohibition in Section 10 of our Constitution 'That no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel, any civil cause to which he is a party,' Ala. Const.1901, § 10."

*Id.* at 1338–39. Because there was no showing that the contract was one of adhesion, even though the remedies reserved were non-mutual, the court concluded that the contract was not unconscionable. *Id.* at 1339.

The majority cites a case that is quite relevant, although not simply for the proposition for which the majority cited it. *Cheek v. United Healthcare, supra,* 378 Md. 139, 835 A.2d 656,

was cited for two unremarkable propositions, that "[t]he determination of whether there is an agreement to arbitrate ... depends on contract principles since arbitration is a matter of contract" and "[t]o be binding and enforceable, contracts ordinarily require consideration." *Id.* at 147, 835 A.2d at 661, citing *Harford County v. Bel Air, supra,* 348 Md. at 381–82, 704 A.2d at 430. While alluded to briefly, the real value of *Cheek* to this case was not really explored. As the majority noted, the Court, in that case, held invalid and unenforceable, as illusory, an arbitration clause in an employment contract that reserved to the employer "the right to alter, amend, modify, or revoke the [arbitration] Policy at its sole and absolute discretion at any time with or without notice." *Id.* at 142–43, 835 A.2d at 658. Cheek made a number of arguments as to why the arbitration policy in that case should be declared invalid, including the one that we adopted, that the employer's promise to arbitrate was "illusory." [4] *Id.* at 145, 835 A.2d at 660. On the other hand, the employer contended that it and Cheek "entered into a valid and enforceable arbitration agreement," supported by "mutuality of obligation", its promise of

---

4. In *Floss v. Ryan's Family Steak Houses, Inc.,* 211 F.3d 306 (6th Cir.2000), the employee signed as a condition of employment an arbitration agreement with an arbitration service provider, which in addition to complete discretion as to the rules of arbitration, reserved to the arbitration services provider "the unlimited right to modify the rules without the employee's consent." *Id.* at 310. Noting that "a promise may in effect promise nothing at all," as when "a promisor retains the right to decide whether or not to perform the promised act," *id* at 315, the court ruled:

"[the arbitration services provider]'s right to choose the nature of its performance renders its promise illusory. As Professor Williston has explained:

'Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect destroys the promise and makes it merely illusory. 1 SAMUEL WILLISTON, CONTRACTS §§ 43, at 140 (3d ed. 1957). EDSI's illusory promise does not create a binding obligation. The purported arbitration agreement therefore lacks a mutuality of obligation. Without a mutuality of obligation, the agreement lacks consideration and, accordingly, does not constitute an enforceable arbitration agreement.' "

*Id.* at 316.

employment and to submit to arbitration "all employment related disputes which are based on a legal claim" for, *inter alia,* Cheek's promise to abide by the arbitration policy. The reserved right to modify the arbitration policy, it maintained, did not impact "the issue of mutuality." *Id.*

We rejected the employer's arguments and, although the employer, in that case, had initiated the arbitration proceedings, held that the arbitration policy was unenforceable. We explained:

"A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement. *See Tyler v. Capitol Indemnity Ins. Co.,* 206 Md. 129, 134, 110 A.2d 528, 530 (1955)(recognizing that " 'If [an] option goes so far as to render illusory the promise of the party given the option, there is indeed no sufficient consideration, and therefore no contract . . . . ' ") (quoting 1 Williston on Contracts, Sec. 141 (Rev. Ed.)). *See* also Restatement of Contracts 2d §§ 77 cmt. a (1981) ('Where the apparent assurance of performance is illusory, it is not consideration for a return promise.'); 2 Arthur L. Corbin, Corbin on Contracts §§ 5.28 (2003)(explaining that 'an illusory promise is neither enforceable against the one making it, nor is it operative as a consideration for a return promise,' and that 'if there is no other consideration for a return promise, the result is that no contract is created.').

"An 'illusory promise' appears to be a promise, but it does not actually bind or obligate the promisor to anything. An illusory promise is composed of 'words in a promissory form that promise nothing.' Corbin on Contracts §§ 5.28 (2003). 'They do not purport to put any limitation on the freedom of the alleged promisor. If A makes an illusory promise, A's words leave A's future action subject to A's own future whim, just as it would have been had A said nothing at all.' *Id.* Similarly, the Restatement of Contracts explains that '[w]ords of promise which by their terms make performance entirely optional with the "promisor" whatever may happen,

or whatever course of conduct in other respects he may pursue, do not constitute a promise.' Restatement of Contracts 2d §§ 2 cmt. e. Likewise, 'the promise is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his performance. The unlimited choice in effect destroys the promise and makes it merely illusory.' 1 Samuel Williston, Contracts, §§ 4:24 (4th Ed. 1990)."

*Cheek v. United Healthcare,* 378 Md. at 148–49, 835 A.2d at 661–62.

Although it does not carve out expressly an exception for itself alone, as was done in *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989, 993 (1999),[5] the arbitration clause with which we are concerned in this case falls within this construct. With the right to access the court for the foreclosure remedy, which, as a practical purpose, has significance only to it, certainly not the petitioners, who do not have any of the lender's property as security, the respondent's "access to the courts is wholly preserved in every conceivable situation where [it] would want to secure judicial relief against [the petitioners]." *Arnold v. United Companies Lending Corporation,* 204 W.Va. 229, 511 S.E.2d 854, 861 (1998). Thus, al-

---

**5.** The arbitration clause found unconscionable in *Iwen v. U.S. West Direct,* 293 Mont. 512, 977 P.2d 989 (1999), as pertinent, provided:

"*ARBITRATION.* Any controversy or claim arising out of or relating to this Agreement, or breach thereof, other than an action by Publisher for the collection of the amounts due under this Agreement, shall be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association...."

*Id.* at 993. Explaining why the arbitration clause was unconscionable, the Supreme Court of Montana opined:

"Drafted as such, the weaker bargaining party has no choice but to settle all claims arising out of the contract through final and binding arbitration, whereas the more powerful bargaining party and drafter has the unilateral right to settle a dispute for collection of fees pursuant to the agreement in a court of law. As a practical matter, it is arguable that the primary reason U.S. West Direct would seek a remedy against Iwen, or any other advertiser for that matter, is if the advertiser refused to pay his or her advertising bill."

*Id.* at 995.

though the effect may be a bit more subtle than the arbitration policy in *Cheek v. United Healthcare*, it is clear that the respondent has an option comparable to that the employer retained in that case. Exercisable at its sole discretion, without the petitioners' consent and at any time, the respondent is free to choose either an arbitration option or a judicial one, while, at the same time, the petitioners are limited to only the arbitration option, having, for all intents and purposes and in fact, waived all of their judicial rights.[6]

---

**6.** Arbitration is an alternative dispute resolution method and forum. It is not the primary method or forum, that status belongs to the courts. To be sure, arbitration enjoys a favored status, but that has meaning in a given case only after the parties have elected that mode of dispute resolution. Unless and until the parties have agreed to arbitrate their dispute, the only and, therefore, favored, dispute resolution mechanism is litigation in court. Once elected by the parties, arbitration substitutes for the court to resolve the dispute in that particular case; it does not supplement the court, except to the extent that the parties agree that it does.

It is clear, therefore, that, for there to be arbitration of a dispute, the parties to that dispute must have elected that mode of dispute resolution, must have agreed to arbitrate. But because no party is required to enter into an agreement to arbitrate, no party is required to arbitrate a dispute. Certainly, a party cannot be made to initiate an arbitration agreement, negotiate for an arbitration clause or include such a clause in that party's pre-printed form contracts.

The respondent fully understood, as its form contract attests, these principles of arbitration practice. Nevertheless, the majority purports to reserve a principle purely antithetical to arbitration, whether arbitration can be agreed to in connection with a remedy that only a court can give. Thus, it says:

"We need not decide in this case whether, in a situation where (1) one party to an agreement containing a valid arbitration clause reserves the right to seek a judicial remedy that only a court can provide, such as foreclosure or a mechanic's lien, (2) the party opts for that remedy, (3) a contract defense is asserted by the other party to liability, and (4) that party demands arbitration of the dispute, the court, on motion and pursuant to Maryland Code, §§ 3–207 and 3–209 of the Courts and Judicial Proceedings Article or the counterpart provisions in the Federal Arbitration Act, would be required to stay the judicial proceeding and direct that dispute to be resolved in arbitration. That issue is not presently before us."

386 Md. at 449–50 n. 13, 872 A.2d at 757–58 n. 13.

In my view, and apparently that of the respondent, who did not ask the Court to do so, there is nothing to reserve. Either arbitration was validly elected or it was not. In the case of the former, all disputes were arbitrable except those purportedly reserved. What was purport-

The situation confronting the West Virginia Supreme Court of Appeals in *Arnold, supra,* was quite similar. There, an elderly couple was solicited by a loan broker, who offered to arrange a loan. The loan was procured and as a part of the loan transaction, the borrowers signed an arbitration agreement. Like the arbitration agreement in this case, it provided that "all ... controversies ... relating to the extension of credit (the loan) by the Lender to Borrower ... including ... the validity and construction of this arbitration provision shall be resolved solely and exclusively by arbitration." Also like the clause sub judice, it made an exception for "foreclosure proceedings ..., proceedings pursuant to which Lender seeks a deficiency judgment, or any comparable procedures allowed under applicable law pursuant to which a lien holder may acquire title to the Property which is security for this loan and any related personal property ... upon default by the Borrower under the mortgage loan documents," as well as for:

> "The Lender's right to submit and to pursue in a court of law any actions related to the collection of the debt ... or ... an application by or on behalf of the Borrower for relief under the federal bankruptcy laws of [sic] any other similar laws of general application for the relief of debtors."

511 S.E.2d at 858. The court held that "where an arbitration agreement entered into as part of a consumer loan transaction contains a waiver of the borrower's rights, including access to the courts, while preserving the lender's right to a judicial forum, the agreement is unconscionable and, therefore, void and unenforceable as a matter of law." *Id.* at 862. This was because, the court explained,

edly reserved was the respondent's right to bring a foreclosure action in court. The parties simply did not agree that arbitration would apply except where only the court could provide a remedy. The respondent need not have introduced the subject of arbitration at all and it certainly need not have required that all disputes be arbitrated. Having done so, the respondent cannot be heard to complain when the clause is enforced as written. Thus, the majority, in addition to all else, is rewriting the contract in favor of the respondent.

"Like the 'rabbits and foxes situation,' [7] ... the wholesale waiver of the Arnolds' rights together with the complete preservation of United Lending's rights 'is inherently inequitable and unconscionable because in a way it nullifies all the other provisions of the contract.' "

*Id.* at 861–62, quoting *Board of Educ. of Berkeley County v. W. Harley Miller, Inc.,* 160 W.Va. 473, 236 S.E.2d 439, 443 (1977).

*Acorn v. Household International, Inc.* is, on this point, to the same effect. There, as part of loan transactions, debtors signed arbitration agreements, pursuant to which they, and purportedly the lender, agreed to arbitrate, without resort to class actions or joinder or consolidation of claims, "any claim, dispute, or controversy ... including initial claims, counterclaims and third party claims, arising from or relating to this Agreement or the relationships which result from this Agreement." The arbitration agreement, however, contained an exception:

"No provision of, nor the exercise of any rights under Arbitration Rider shall limit the right of any party during the pendency of any Claim, to seek and use ancillary or preliminary remedies, judicial or otherwise, for the purposes of realizing upon, preserving, protecting or foreclosing upon

---

7. The reference is to a discussion, In *Board of Educ. of Berkeley County v. W. Harley Miller, Inc.,* 160 W.Va. 473, 236 S.E.2d 439, 443 (1977), about a similar contract involving an arbitration clause, which the court in *Arnold v. United Companies Lending Corporation,* 204 W.Va. 229, 511 S.E.2d 854, 861 (1998), said "caricatured ... the contract between the rabbits and foxes." The flavor of the Court's caricature is captured in the following paragraph:

"The basic problem in all arbitration cases could probably best be explained not in terms of legal characterizations such as "conditions precedent," 'ousting courts of their jurisdiction,' or 'revocability,' but rather by a hypothetical case in the tradition of the ancient fableist Aesop. Let us assume for a minute that for some reason all the rabbits and all the foxes decided to enter into a contract for mutual security, one provision of which were that any disputes arising out of the contract would be arbitrated by a panel of foxes. Somehow that shocks our consciences, and it doesn't help the rabbits very much either."

any property involved in any Claim or subject to the loan documents."

211 F.Supp.2d at 1162. The debtors argued that the exception for foreclosure, among other provisions,[8] rendered the arbitration agreement "excessively one-sided and substantively unconscionable." *Id.* at 1170. The court agreed, finding dispositive, *Flores v. Transamerica HomeFirst, Inc.,* 93 Cal.App.4th 846, 850, 855, 113 Cal.Rptr.2d 376, 379, 383 (2001), in which an arbitration agreement that excluded the lender's 'right to foreclose against the Property', from its scope, was held to be substantively unconscionable:

> "As a practical matter, by reserving to itself the remedy of foreclosure, HomeFirst has assured the availability of the only remedy it is likely to need. . . . The clear implication is that HomeFirst has attempted to maximize its advantage by avoiding arbitration of its own claims."

*Id.* at 1172–73. *See* also *Williams v. Aetna Finance Company,* 83 Ohio St.3d 464, 700 N.E.2d 859, 863 (1998) (arbitration clause covered all disputes "other than judicial foreclosures and cancellations regarding real estate security").

An arbitration agreement that applies to both parties yet may contain provisions that are so inordinately one-sided, as to lack sufficient mutuality for enforcement. Such is the case with the class action waiver provision in this case. As indicated, the clause is facially neutral. Nevertheless, it is the actual effect of the provision, not its facial neutrality, that determines whether it is sufficiently bilateral. *Leonard v. Terminix International Company, L.P.,* 854 So.2d 529, 538 (Ala.2002); *Szetela v. Discover Bank,* 97 Cal.App.4th 1094, 1100, 118 Cal.Rptr.2d 862, 867 (2002); *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1179 (9th Cir.2003); *Ting v. AT&T,* 319 F.3d at 1150; *Acorn,* 211 F. supp.2d at 1169 ("Whether an arbitration agreement is sufficiently bilateral is determined by an examination of the actual effects of the challenged provisions"). *See*

---

8. The other provisions were the class action waiver provision and a provision requiring that any arbitration award be kept confidential.

*State ex rel Dunlap v. Berger,* 211 W.Va. 549, 567 S.E.2d 265, 279–80 (2002) (class action and punitive damages). *See* also *D.R. Horton, Inc. v. Green,* 96 P.3d 1159, 1165 (Nev.2004) (provision assessed liquidated damages only on homebuyer for foregoing arbitration and it was not conspicuous).

*Szetela* is illustrative and instructive. The arbitration clause at issue in that case provided, as relevant:

"*Arbitration. We Are Adding a New Section to Read as Follows:*

"*Arbitration of Disputes.* In the event of any past, present or future claim or dispute (whether based upon contract, tort, statute, common law or equity) between you and us arising from or relating to your Account, any prior account you have had with us, your application, the relationships which result from your Account or the enforceability or scope of this arbitration provision, of the Agreement or of any prior agreement, you or we may elect to resolve the claim or dispute by binding arbitration.

"If Either You or We Elect Arbitration, Neither You Nor We Shall Have the Right to Litigate That Claim in Court or to Have a Jury Trial on That Claim. Pre–Hearing Discovery Rights and Post–Hearing Appeal Rights Will Be Limited. Neither You Nor We Shall Be Entitled to Join or Consolidate Claims in Arbitration by or Against Other Cardmembers with Respect to Other Accounts, or Arbitrate Any Claims as a Representative or Member of a Class or in a Private Attorney General Capacity. Even if all parties have opted to litigate a claim in court, you or we may elect arbitration with respect to any claim made by a new party or any new claims later asserted in that lawsuit, and nothing undertaken therein shall constitute a waiver of any rights under this arbitration provision."

*Id.* at 1096–97, 118 Cal.Rptr.2d at 864. Characterizing the one-sidedness of the no class action provision as "manifest" and "blindingly obvious," *id.* at 1100–1101, 118 Cal.Rptr.2d at 867, the court found it to be unconscionable. It first rejected the facial neutrality of the provision:

"Although styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact Discover, because credit card companies typically do not sue their customers in class action lawsuits."

*Id.* at 1101, 118 Cal.Rptr.2d at 867. Then, pointing out that one of the policy reasons for class actions is to promote judicial economy in appropriate cases, *id.* at 1101–02, 118 Cal.Rptr.2d at 868, it addressed the real reason for the no class action requirement:

"This provision is clearly meant to prevent customers, such as Szetela and those he seeks to represent, from seeking redress for relatively small amounts of money, such as the $29 sought by Szetela. Fully aware that few customers will go to the time and trouble of suing in small claims court, Discover has instead sought to create for itself virtual immunity from class or representative actions despite their potential merit, while suffering no similar detriment to its own rights."

*Id.* at 1101, 118 Cal.Rptr.2d at 867. Apropos this case, the court concluded:

"It is the *manner* of arbitration, specifically, prohibiting class or representative actions, we take exception to here. The clause is not only harsh and unfair to Discover customers who might be owed a relatively small sum of money, but it also serves as a disincentive for Discover to avoid the type of conduct that might lead to class action litigation in the first place. By imposing this clause on its customers, Discover has essentially granted itself a license to push the boundaries of good business practices to their furthest limits, fully aware that relatively few, if any, customers will seek legal remedies, and that any remedies obtained will only pertain to that single customer without collateral estoppel effect. The potential for millions of customers to be overcharged small amounts without an effective method of

redress cannot be ignored. Therefore, the provision vio-
lates fundamental notions of fairness."

*Id.*

Aware of these opinions, the majority criticizes them as
giving "short shrift" to the "strong policy, made clear in both
federal and Maryland law, that favors the enforcement of
arbitration provisions." 386 Md. at 438–39, 872 A.2d at 751.
That agreements to arbitrate are favored is well settled.
What the majority and the cases that give "short shrift" to the
arguments on the other side of the issue miss is that arbitra-
tion is not the only dispute resolution mechanism that is
favored. Access to the courts is a fundamental right in
Maryland, as reflected by the fact that the concept is embod-
ied in Article 19 of the Maryland Declaration of Rights.[9] *See
State ex rel Dunlap v. Berger, supra,* 567 S.E.2d at 279 ("The
consumer signed a contract of adhesion containing provisions
that would bar him from utilizing two remedies—punitive
damages and class action relief—that are essential to the
enforcement and effective vindication of the public purposes
and protections [ ] underlying the law.").

I believe in alternate dispute mechanisms. They must be
appropriate and fair, however. That is a sentiment that is
increasingly, I hope, being expressed and reflected, not simply
in court decisions, but in policy directives from the profession-
als, such as Judicial Arbitration and Mediation Services, in the
field.[10] But alternate dispute resolution agreements, I fear,

---

**9.** MD Constitution, Declaration of Rights, Art. 19 provides:

"That every man, for any injury done to him in his person or
property, ought to have remedy by the course of the Law of the Land,
and ought to have justice and right, freely without sale, fully without
any denial, and speedily without delay, according to the Law of the
Land."

**10.** The Washington Post carried an article concerning the decision of
one of the nation's largest arbitration firms, Judicial Arbitration and
Mediation Services (JAMS), to no longer enforce contracts that "bar
consumers and employees from bringing class-action cases before its
neutral arbitrators." Caroline E. Mayer, *Arbitration Group Backs Class
Actions; Firm Won't Enforce Bans in Contracts,* WASH. POST, Nov. 25,

likely will be neither appropriate nor fair, where, via a contract of adhesion, "agreements" are obtained which are manifestly one-sided in favor of the drafter of the agreement.

I dissent. Judge GREENE joins in the views herein expressed.

---

2004, at E4. JAMS determined that "the class action restriction 'is an unfair restriction on the rights of the individual consumer.' "